■ AMBAC ASSURANCE CORPORATION et al., Appellants, v EMC MORTGAGE LLC et al., Respondents. [995 NYS2d 545]—

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered June 18, 2013, which, to the extent appealed from as limited by the briefs, granted defendants' motion to dismiss the second and third causes of action of the amended complaint, unanimously affirmed, without costs.

This action relates to seven residential mortgage-backed securities (RMBS) transactions that originated between March 2006 and November 2006 (the transactions). Plaintiffs Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation (collectively, Ambac) partially insured the transactions, defendant EMC Mortgage LLC (EMC) sponsored them, and Bear, Stearns & Co. Inc. (Bear Stearns) underwrote them.[1]

As sponsor, EMC purchased the underlying loans from third-party originators and sold and assigned its entire interest in the loans to an affiliated special purpose entity (the depositor). The depositor then sold the mortgage loans into securitization trusts under loan purchase agreements. Each transaction had an independent trustee (the trustee) who, under a pooling and servicing agreement, was responsible for acting on the certificate holders' behalf. Ambac claims that a later investigation of the transactions revealed that EMC and Bear Stearns had engaged in fraud and breached the contracts, causing plaintiffs hundreds of millions of dollars in damages.

A series of interlocking agreements governs the transactions. The relevant documents in this case are the Mortgage Loan Purchase Agreements (MLPAs) and the Pooling and Servicing Agreements (PSAs); the agreements set forth the various parties' rights and obligations.

Section 7 of the MLPAs contains a series of representations and warranties by EMC concerning the characteristics of the individual mortgage loans. Section 8 of the MLPAs also contains a series of representations and warranties, including section 8 (vii); in that section, EMC represented that the transactions' prospectus supplements describing the mortgage loans did not include untrue statements of material fact.

The PSAs that govern the transactions relate to the sale of the mortgage loans from the depositor to the securitization trusts. Together, the MLPAs and the PSAs create a repurchase protocol, or procedure (the repurchase protocol), under which certain parties to the agreements could compel EMC to repurchase loans that were in breach of the MLPAs' representations or warranties provisions.

Section 7 of the MLPAs states that the repurchase protocol is the "sole and exclusive" remedy available to the "Purchaser" (also known as the depositor), the "Trustee" and the "Certifi-

---

1. Defendants J.P. Morgan Securities LLC and JPMorgan Chase Bank, N.A. did not participate in the transactions; Ambac has sued them solely as successors to Bear Stearns and EMC, respectively.

cateholders" for a breach of representations or warranties: "The obligations of the Mortgage Loan Seller [EMC] to cure, purchase or substitute a qualifying Substitute Mortgage Loan shall constitute the Purchaser's, the Trustee's and the Certificateholders' sole and exclusive remedies under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans, except for the obligation of the Mortgage Loan Seller to indemnify the Purchaser for such breach . . . ."

Under the PSAs, Ambac, as insurer, is expressly named as a third-party beneficiary with respect to the rights of the insured certificateholders.[2] Under section 2.03 of the PSAs, the trustee is expressly named as the party with authority to enforce the repurchase protocol. Also under that section, the depositor, "on behalf of the Trust for the benefit of the Certificateholders and the Certificate Insurer [Ambac]," assigned to the trustee all of its rights under the MLPAs.

Section 2.03 further provides that EMC's obligations to substitute or repurchase a mortgage loan "shall be the Trustee's and Certificateholder's sole remedy for any breach thereof." To that end, section 2.03 states that at the trustee's request, "the Depositor shall take such actions as may be necessary to enforce the . . . right, title and interest on behalf of the Trust and the Certificateholders or shall execute such further documents as the Trustee may reasonably require in order to enable the Trustee to carry out such enforcement." Finally, section 2.03 states, "If the Depositor . . . or the Trustee discovers a breach of any of the representations and warranties set forth in the Mortgage Loan Purchase Agreement . . . the party discovering the breach shall give prompt written notice of the breach to the other parties."

Because Ambac is not a direct party to the MLPAs or the PSAs, its contractual rights, to the extent they existed, arose from its status as a third-party beneficiary of the agreements. Unlike other transactions where Ambac acted as a certificate insurer, these transactions did not include separate insurance and indemnity agreements specifically setting forth Ambac's rights.

Since the nationwide mortgage crisis, Ambac has suffered enormous losses on the transactions and has paid more than $300 million to certificateholders under the relevant insurance policies. As a result, Ambac, a Wisconsin corporation, is under court-supervised statutory rehabilitation in that state.

---

2. Ambac maintains that it is also a third-party beneficiary of the MLPAs, with the direct right to enforce breaches of those agreements, although there is no similar language in the MLPAs.

In August 2012, in an attempt to recover its losses, Ambac brought this action against defendants. In its complaint, Ambac alleged that Bear Stearns, EMC, and their affiliates perpetrated a massive fraud by representing to Ambac that the mortgage loans were originated under established underwriting guidelines and were of good quality. Ambac further alleged that defendants breached the section 7 representation and warranty provisions and section 8 (vii) of the MLPAs, causing Ambac "compensatory, consequential and/or equitable damages."

Ambac argues on appeal, as it did before the motion court, that the "sole remedy" language of Section 7 of the MLPAs does not apply to it, as it was not identified in the PSAs as a party whose rights were limited to enforcement of EMC's loan repurchase obligation. Moreover, Ambac argues, the repurchase protocol appears in section 7 of the MLPAs, and thus applies only to the warranties set forth in section 7. This interpretation makes good sense, according to Ambac, because the section 7 warranties are made as to each individual loan, whereas the section 8 warranties concern the transaction as a whole. Ambac also asserts that the motion court effectively read the section 8 warranties out of the MLPAs, thus stripping Ambac of its rights as a third-party beneficiary to the agreements. To the extent the PSAs created an ambiguity concerning the scope of the limitation on remedies, Ambac argues that the ambiguity should not be resolved on a motion to dismiss, and therefore, that the second cause of action should be reinstated.

Further, Ambac states that it had full rights to enforce the repurchase protocol for breaches of section 7 of the MLPAs because there is no language in the agreements explicitly barring it from doing so. To support this argument, Ambac relies on our recent decision in *Assured Guar. Mun. Corp. v DLJ Mtge. Capital, Inc.* (117 AD3d 450 [1st Dept 2014]), pointing to that case to support its argument that, absent express limiting language, its remedial rights as a third-party beneficiary are not limited. Additionally, Ambac argues, the assignment to the trustee does not deprive Ambac of standing.

We find that the "sole and exclusive" remedy provision applies to alleged breaches of section 8 (vii), as well as to breaches of section 7. Moreover, as discussed below, Ambac does not have standing to bring those claims because the agreements transferred Ambac's rights to the trustee. Thus, the motion court properly dismissed plaintiffs' second cause of action, for defendants' alleged breach of the representation and warranty provisions contained in section 8 (vii) of the MLPAs, and the third cause of action, for breach of the representation and warranty provisions contained in section 7 of the MLPAs.

To begin, section 7 of the MLPAs provides that the repurchase protocol is the "sole and exclusive remedy" "under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans." Contrary to Ambac's contention, section 7 does not state that the repurchase protocol is the sole and exclusive remedy "under this Section 7." On the contrary, the omission of a term from the sentence at issue in a contract, especially when that term is used multiple times in the same paragraph, must be deemed an intentional choice of the parties to the agreement—a category to which Ambac does not even belong (*see Assured Guar. Mun. Corp.*, 117 AD3d at 450-451).

Indeed, a reasonable reading of section 7 shows that the contracting parties knew how to limit certain remedies to that section. With the repurchase protocol, however, they simply chose not to. For example, the MLPAs state that any cause of action for breach "of any representations and warranties *made in this Section 7* shall accrue as to any Mortgage Loan upon (i) discovery of such breach . . . and (ii) failure . . . to cure" (emphasis added). The repurchase protocol contractual language, however, states that it is the sole and exclusive remedy "under this Agreement." Similarly, section 2.03 (b) of the PSAs provides that the repurchase protocol applies to "a breach of any of the representations and warranties set forth in the [MLPAs]," not only to the section 7 representations and warranties.

Ambac further argues that the section 8 representations and warranties are materially different from the section 7 warranties, and therefore, that a breach of those warranties cannot be subject to the same remedies. However, as the motion court properly found, the section 8 warranties "largely relate to, and overlap with, the . . . section 7 warranties." In making its argument, Ambac relies solely on the section 8 (vii) warranty, addressing the accuracy of the information in the prospectus supplements concerning the mortgage loans in the transactions. However, section 7 (xx) of the MLPAs contains essentially the same warranty: "the information set forth in . . . the Prospectus Supplement with respect to the Mortgage Loans is true and correct in all material respects." This provision refers to information concerning the entire pool of mortgage loans, and therefore contradicts Ambac's argument that section 7 contains only "loan-level" warranties while section 8 contains "transaction-level" warranties concerning the characteristics of the mortgage loans as a whole.

Ambac alternatively argues that any ambiguity in the agree-

ments, when read together, concerning whether the "sole and exclusive remedy" provision is limited to section 7 breaches, should not be resolved in the context of a motion to dismiss (*Telerep, LLC v U.S. Intl. Media, LLC*, 74 AD3d 401, 403 [1st Dept 2010]). Ambac notes—correctly, in light of our recent *Assured Guaranty* decision—that the "sole and exclusive" repurchase protocol remedy does not apply to it because the sole remedy provisions do not explicitly mention that they bind Ambac (*Assured Guar. Mun. Corp.*, 117 AD3d at 450-451). Indeed, section 7 of the MLPAs states that the repurchase protocol shall be the sole and exclusive remedy of the purchaser, trustee and certificateholders, but does not state that it applies to Ambac, the certificate insurer (*compare Syncora Guar. Inc. v EMC Mtge. Corp.*, 2011 WL 1135007, 2011 US Dist LEXIS 31305 [SD NY, Mar. 25, 2011, No. 09-CV-3106 (PAC)] [insurer bargained for broader rights in a separate insurance and indemnity agreement, and therefore was not limited by the "sole and exclusive" remedy clause]).

Nevertheless, under the PSAs, the depositor's "right, title and interest" in the MLPAs, including its right to pursue breaches of the representation and warranty provisions of the agreements, was assigned into the securitization trust; the trust confers upon the trustee the full responsibility for enforcing those claims on behalf of the certificateholders and, expressly, on behalf of the certificate insurer—namely, Ambac. The trustee is responsible for pursuing claims for "breach of any of the representations and warranties set forth in the [MLPAs]," whether found in section 7 or section 8. Thus, while the "sole and exclusive" remedy clause does not, on its face, technically limit Ambac, Ambac does not have standing to pursue its claims because section 2.03 of the PSAs prevents it from doing so. Rather, that right is vested with the trustee, who is listed as a party that the sole remedy provision does bind.

Ambac further argues that, as a third-party beneficiary, it has standing to enforce the repurchase protocol because the agreements do not "explicitly bar" it from doing so. This argument is unpersuasive because, as discussed above, section 2.03 of the PSAs provides that the depositor's "right, title and interest" in the MLPAs, including the repurchase protocol, is assigned into the securitization trust "on behalf of" both the certificateholders and the certificate insurer and confers upon the trustee the full responsibility for enforcing the repurchase protocol on their behalf. New York state and federal courts have, in fact, rejected monoline insurers' attempts to enforce repurchase obligations where the relevant contracts conferred the right to enforce those

obligations on other parties (*see e.g. CIFG Assur. N. Am., Inc. v Goldman, Sachs & Co.*, 2012 WL 1562718, 2012 NY Misc LEXIS 3986 [Sup Ct, NY County, May 1, 2012], *mod* 106 AD3d 437 [1st Dept 2013] [modification was to reinstate fraudulent inducement claims]; *Assured Guar. Mun. Corp. v UBS Real Estate Sec., Inc.*, 2012 WL 3525613, 2012 US Dist LEXIS 115240 [SD NY, Aug. 15, 2012, No. 12-CV-1579 (HB)]]).

For example, in *Assured Guaranty* (2012 WL 3525613, *4, 2012 US Dist LEXIS 115240, *12-13), the PSA for the relevant transaction required that the monoline insurer give notice of breach to the trustee, who in turn was to give notice to the sponsor and enforce the sponsor's repurchase obligations. The court dismissed the insurer's claim against the sponsor for breach of the repurchase obligation because the PSAs did not confer direct enforcement rights upon it (2012 WL 3525613, *4, 2012 US Dist LEXIS 115240, *13-14). Ambac attempts to distinguish this case by arguing that the contracts in *Assured Guaranty* and *CIFG*, unlike here, contained language stating that the trustee "shall enforce" the repurchase protocol "at the direction of" the certificate insurer. This contention, however, is unpersuasive. Identical language is not necessary because, as discussed above, the detailed procedures set forth in section 2.03 of the PSAs state that the responsibility to enforce the repurchase protocol falls to the trustee on Ambac's behalf.

Finally, Ambac argues that the motion court's decision leaves it "without a remedy" at all for defendants' alleged contract breaches. This argument is also unpersuasive. As defendants aptly note, trustees may, and often do, seek repurchase of mortgage loans where they are dissatisfied with a sponsor's response. However limited Ambac's remedies may be, they are what the plain language of the agreements provide.

Ambac is not entitled to rewrite the agreements simply because it dislikes, in hindsight, the agreements' terms. Concur—Mazzarelli, J.P., Moskowitz, DeGrasse and Kapnick, JJ.