This opinion is uncorrected and subject to revision before publication in the New York Reports.
----------------------------------------------------------------

No. 39
Nomura Home Equity Loan, Inc.,
Series 2006-FM2, by HSBC Bank
USA, National Association, solely
in its capacity as Trustee,
et al.,
             Respondents,
        v.
Nomura Credit & Capital, Inc.,
             Appellant.
(And Three Other Actions.)


        Joseph J. Frank, for appellant.
        Michael S. Shuster, for respondents.
        Securities Industry and Financial Markets Association;
Sand Canyon Corporation, <u>amici</u> <u>curiae</u>.


STEIN, J.:

        In these appeals stemming from four residential mortgage-backed securities (RMBS) transactions, we are asked to decide whether claims for general contract damages based on alleged breaches of a "no untrue statement" provision can withstand a motion to dismiss based on a contract provision

- 1 -

mandating cure or repurchase as the sole remedy for breaches of
mortgage loan-specific representations and warranties.  We hold
that, inasmuch as the claims for general contract damages at
issue here are grounded in alleged breaches of the mortgage loan-
specific representations and warranties to which the limited
remedy fashioned by the sophisticated parties applies,
plaintiffs' claims for general contract damages should be
dismissed.

-I-

In each of the RMBS transactions at issue, defendant
Nomura Credit & Capital, Inc. selected and sold a pool of
mortgage loans through an affiliated limited-purpose company to a
securitization trust in exchange for money raised from investors.
Defendant, as sponsor of the securitizations, acquired the
mortgage loans from institutions that made the loans to
individual borrowers, and then sold the pool of loans to an
affiliated purchaser, known as a depositor, with the sale of each
loan pool occurring pursuant to its own mortgage loan purchase
agreement (MLPA).  In turn, the depositor placed each pool of
loans into a separate trust, with plaintiff HSBC Bank USA,
National Association (HSBC) as the trustee, in accordance with
four pooling and service agreements (PSAs).

A forensic analysis of some of the underlying mortgage
loans conducted by certain investors following the subsequent
collapse of the housing market allegedly revealed that many of

those loans did not conform to representations and warranties made by defendant.  After providing notice of the breaches and an opportunity to cure, HSBC, as trustee of the securitization trusts, commenced this litigation by bringing an action on behalf of each trust.

HSBC asserted causes of action for breach of the MLPAs and PSAs, alleging that defendant breached the specific representations and warranties it made concerning the suitability of each of the mortgage loans contained in the loan pools.  In addition, HSBC sought specific performance of the remedy that expressly applies to such breaches under the contracts, i.e., that defendant either cure the breaches or repurchase the loans.[1] HSBC also asserted claims seeking general contract damages for alleged breaches of representations made by defendant concerning the transaction as a whole, specifically the representation that the contracts and related documents contained no untrue statements; it is these claims that are before us.

Certain provisions of the MLPAs and PSAs form the core of the dispute between the parties.[2]  Section 7 of the MLPAs is entitled "Representations, Warranties and Covenants of the Seller."  This section includes certain general representations and warranties made by defendant, including, for example, that:

---

[1] Defendant does not challenge before us the lower court rulings pertaining to those causes of action.

[2] The parties agree that, for purposes of these actions, the language in the MLPAs and PSAs for each transaction is identical.

it is a corporation duly organized, validly existing and in good

standing under the laws of Delaware; it has duly authorized the

execution, delivery and performance of the agreement and will be

bound by it; and the consummation of the transactions

contemplated under the agreement are in the ordinary course of

defendant's business. Section 7 also includes the provision

referred to by the parties as the "No Untrue Statement

Provision," which states that:

> "This Agreement does not contain any untrue statement
> of material fact or omit to state a material fact
> necessary to make the statements contained herein not
> misleading. The written statements, reports and other
> documents prepared and furnished or to be prepared and
> furnished by the Seller pursuant to this Agreement or
> in connection with the transactions contemplated
> hereby taken in the aggregate do not contain any
> untrue statement of material fact or omit to state a
> material fact necessary to make the statements
> contained therein not misleading."

Section 8 of each MLPA is entitled "Representations and

Warranties of the Seller Relating to the Mortgage Loans"

(hereinafter, Mortgage Representations).  In section 8, defendant

made specific representations and warranties about each mortgage

loan, including that: information provided to the agencies that

rated the certificates representing interests in the

securitization trusts, including loan level detail, is true and

correct according to the rating agency requirements; no fraud has

taken place on the part of the mortgagor or any other party

involved in the origination or servicing of the mortgage loan;

the mortgage file contains an appraisal of the related mortgaged

property which was made by a qualified appraiser pursuant to applicable law and professional standards prior to loan approval; and each mortgage loan is and will be a mortgage loan arising out of the originator's practice in accordance with the originator's underwriting guidelines.

Section 9 of the MLPAs is entitled "Repurchase Obligation for Defective Documentation and for Breach of Representation and Warranty."  That section provides that, upon a party's discovery of any materially defective document or "a breach of any of the representations and warranties contained in Section 8 that materially and adversely affects the value of any Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee," that party must give notice to defendant. Defendant then must cure the breach or, if that is not possible, repurchase the affected mortgage loan at a purchase price defined under the PSA.  Significantly, section 9 (c) states that "[i]t is understood and agreed that the obligations of [defendant] set forth in this [s]ection 9 to cure or repurchase a defective Mortgage Loan . . . constitute the sole remedies of the Purchaser against [defendant] respecting a missing document or a breach of the representations and warranties contained in [s]ection 8" [emphasis added].  This language is referred to by the parties as the "Sole Remedy Provision."

The PSAs are separate contracts, which refer to certain specific provisions of the MLPAs, but do not incorporate the

MLPAs as a whole.  Section 2.01 of the PSAs assigns to HSBC, as trustee, the depositor's rights under the MLPAs "to the extent of the Mortgage Loans sold."[3]  Under section 2.03 of each PSA, defendant made certain representations and warranties, including a statement that the Mortgage Representations "are true and correct."  Section 2.03 further provides a remedy for a breach of the section 8 representations and warranties that tracks the language of section 9 of the MLPAs -- i.e., that defendant shall cure such breach in all material respects and, if such breach is not so cured, shall repurchase or replace the affected mortgage loans.  Section 2.03 also states, in language that parallels section 9 (c) of the MLPAs, that defendant's obligation to cure, repurchase or replace any mortgage loan to which a breach has occurred shall be the "sole remed[y] . . . against [defendant] respecting such breach" available to the investors, depositor, or trustee. The PSAs do not include provisions comparable to the No Untrue Statement Provision in the MLPAs.

The particular causes of action at issue on this appeal allege that defendant breached the No Untrue Statement Provision in section 7 of the MLPAs by providing certain documents to the trusts -- including the mortgage loan files, mortgage loan schedules, and prospectus supplements -- that contained

---

[3] Although defendant now argues before us that HSBC was assigned only limited rights and, thus, lacks standing to assert claims pursuant to the No Untrue Statement Provision in the MLPAs, that contention was not preserved for our review.

"widespread, pervasive and material misrepresentations and omissions with respect to the Mortgage Loans."  HSBC further claims that the results of the investigation of the mortgage loans, including a review of the loan files, "make clear that [defendant's] breaches of the Mortgage Representations are systemic in nature and adversely affect the vast majority of the [m]ortgage [l]oans in the [t]rust."

Defendant moved to dismiss the complaints pursuant to CPLR 3211 (a) (1) and (7), arguing that the MLPAs and PSAs both provide that the sole remedy for breaches of the Mortgage Representations is cure or repurchase.  Supreme Court granted the motions to dismiss with respect to the causes of action and claims for general contract damages based on alleged breaches of the No Untrue Statement Provision of the MLPAs.  The Appellate Division reinstated those claims, reasoning that, if the parties intended for the Sole Remedy Provision to "apply to both section 8 *and* section 7 breaches, they certainly could have included such language in the contracts" (133 AD3d 96, 108 [1st Dept 2015] [internal quotation marks and citation omitted]).  The Appellate Division granted defendant leave to appeal to this Court, certifying the question of whether its order was properly made.

-II-

It is fundamental that, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (W.W.W. Assoc. v

Giancontieri, 77 NY2d 157, 162 [1990]; see Reiss v Financial
Performance Corp., 97 NY2d 195, 198 [2001]), and that courts
should read a contract "as a harmonious and integrated whole" to
determine and give effect to its purpose and intent (Matter of
Westmoreland Coal Co. v Entech, Inc., 100 NY2d 352, 358 [2003];
see W.W.W. Assoc., 77 NY2d at 162).  Courts may not, through
their interpretation of a contract, add or excise terms or
distort the meaning of any particular words or phrases, thereby
creating a new contract under the guise of interpreting the
parties' own agreements (see ACE Sec. Corp., Home Equity Loan
Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581,
597 [2015]; Matter of Westmoreland Coal Co., 100 NY2d at 358;
Reiss, 97 NY2d at 199).  In that regard, a contract must be
construed in a manner which gives effect to each and every part,
so as not to render any provision "meaningless or without force
or effect" (Ronnen v Ajax Elec. Motor Corp., 88 NY2d 582, 589
[1996]).

In accordance with these principles, courts must honor
contractual provisions that limit liability or damages because
those provisions represent the parties' agreement on the
allocation of the risk of economic loss in certain eventualities
(see Metropolitan Life Ins. Co. v Noble Lowndes Intl., 84 NY2d
430, 436 [1994] [the parties "may later regret their assumption
of the risks of non-performance in this manner, but the courts
let them lie on the bed they made"]; 11-58 Corbin on Contracts, §

58.16 [2017] ["(w)here a contract provides that damages for breach shall not be recoverable beyond a specified sum, it is obvious that the risk of loss beyond that sum is being assumed by the promisee"]). Contract terms providing for a "sole remedy" are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction (see J. D'Addario & Co., Inc. v Embassy Indus., Inc., 20 NY3d 113, 118 [2012]), "especially when entered into at arm's length by sophisticated contracting parties" (Kalisch-Jarcho, Inc. v City of New York, 58 NY2d 377, 384 [1983]).

When reviewing a defendant's motion to dismiss a complaint for failure to state a cause of action, a court must "give the complaint a liberal construction, accept the allegations as true and provide plaintiffs with the benefit of every favorable inference" (Roni LLC v Arfa, 18 NY3d 846, 848 [2011]). Thus, here, we accept as true HSBC's allegations of pervasive breaches of the representations made as to the mortgage loans and misleading omissions in the transaction documents, including the mortgage loan files, mortgage loan schedules, and prospectus supplements.[4] Significantly, however, the complaints

---

[4] The mortgage loan files contain, among other things, the borrower's loan application, documents verifying the borrower's income, assets, and employment, the borrower's credit report, an appraisal of the property secured by the loan, and a statement of the property's occupant status. The mortgage loan schedules, or mortgage loan data tapes, provide certain information about each

themselves affirmatively pleaded that the claims based on alleged breaches of the No Untrue Statement Provision were grounded in "misrepresentations and omissions with respect to the Mortgage Loans," themselves.  That is, HSBC claimed that it was defendant's breaches of the Mortgage Representations -- found in section 8 of the MLPAs, and expressly incorporated by reference in section 2.03 of each PSA -- that were "systemic in nature."

Indeed, HSBC alleged that certain appraisals included in the mortgage loan files were inflated and, thus, there was "strong reason to believe" that these appraisals did not conform to federal guidelines and professional standards, which would constitute a breach of the Mortgage Representation that each appraisal on file was so prepared prior to approval of the mortgage loan.  Morever, HSBC claimed that misrepresentations in the mortgage loan files and missing or incomplete loan files constituted breaches of section 8 Mortgage Representations, specifically those representations made by defendant that no fraud was involved in the origination or servicing of the mortgage loans and that each mortgage loan arose out of the originator's practice in accordance with its underwriting guidelines.  The alleged deficiencies in the mortgage loan

---

mortgage loan, including the loan-to-value ratio, occupancy status, and borrower's credit score.  The prospectus supplements include information for potential investors concerning the offer of certificates representing interests in the securitization trusts.

schedules were also grounded in violations of the Mortgage Representations -- in particular, HSBC claimed that providing the purportedly flawed documents to the rating agencies violated defendant's representation that it had provided such rating agencies with only true and correct information. Similarly, HSBC averred that certain statements in the prospectus supplements constituted breaches of the Mortgage Representations concerning appraisals and underwriting guidelines.

Contrary to the dissenters' assertion that certain allegations of HSBC concerning misstatements in the Mortgage Loan Files (HSBC 2007-3 Compl. ¶ 60 [enumerating certain alleged misrepresentations]) are not grounded in alleged breaches of the Mortgage Representations, we need only look to the next paragraph in the complaint to see that they are (see HSBC 2007-3 Compl. ¶ 61 ["Misrepresentations, such as those described above, strongly suggest fraud by either or both the Mortgagor and the originator in the underwriting of the loan, in breach of MLPA § 8(ii)" (emphasis added)]). In addition, to find a breach of the No Untrue Statement Provision, Judge Feinman creates out of whole cloth a theory contrary to the allegations penned by HSBC (Feinman, J. dissenting op at 9-10; Rivera, J. dissenting op at 17 [joining that analysis]). For example, HSBC claimed that there was reason to believe that certain appraisals contained in the mortgage loan files were biased, in violation of a Mortgage Representation, namely MLPA § 8 (29) (see HSBC 2007-3 Compl. ¶

60).  While the dissenters maintain that the mere presence of inflated property values, if not based on biased appraisals, could violate the No Untrue Statement Provision and not MLPA § 8 (29), they ignore the fact that, to prevail on the claims actually alleged, HSBC must show that the appraisals were biased. The dissenters' contention that HSBC is attempting to prove the opposite of what was actually alleged, is not a "liberal" reading of the complaint; nor is that contention relevant to a determination of "whether the facts as alleged fit within any cognizable legal claim" (Leon v Martinez, 84 NY2d 83, 87-88 [1994] [emphasis added]).  Rather than twisting the complaint in an attempt to read in theories that it does not support, the appropriate inquiry is whether "the instant complaint . . ., although inartfully drafted, adequately alleged for pleading survival purposes" a violation of the No Untrue Statement Provision that is not grounded in a violation of the Mortgage Representations (id. at 88).  The approach of the dissenters strays far from this principle and actually contradicts HSBC's allegations; that is, to succeed on a claim that section 7, but not 8, of the MLPA was violated, HSBC would be required to show both inflated property appraisals and the absence of the very bias that HSBC is, in fact, seeking to prove.  In other words, the cause of action created by the dissenters cannot stand unless HSBC's allegations fail.

The additional theories developed by Judge Feinman in

his dissent and endorsed by Judge Rivera -- concerning alleged misstatements of loan-to-value ratios and owner-occupancy status -- suffer from a similar flaw (Feinman, J. dissenting op at 10-11; Rivera, J. dissenting op at 17). HSBC alleged in the complaints that these misstatements violated specific Mortgage Representations. Contrary to the dissenters' assertion, at no time during the course of this litigation did HSBC itself ever suggest that its complaints alleged the theories that the dissenters now fashion. That is because these theories are untethered to HSBC's claims "as alleged" and do not represent reasonable "inferences" that can be drawn from the actual language in the complaints (see Leon, 84 NY2d at 87).

Therefore, even accepting HSBC's allegations as true and giving HSBC the benefit of every favorable inference, it is readily apparent from the face of the complaints that the alleged breaches of the No Untrue Statement Provision are, in fact, based upon alleged breaches of the Mortgage Representations. However, under both the MLPAs and the PSAs, the sole remedy for breaches of the Mortgage Representations is cure or repurchase. HSBC cannot "subvert this 'exclusive remedies' limitation" of liability by simply re-characterizing its claims (Matter of Westmoreland Coal Co., 100 NY2d at 359). Rather, "[r]eading the [contracts] as a harmonious and integrated whole" (id. at 358) and honoring "the exclusive remedy that the[se] [sophisticated] parties fashioned" (J D'Addario, 20 NY3d at 119), we conclude

that the Sole Remedy Provision applies, precluding HSBC from seeking general contract damages for the particular claims challenged on this appeal.

                              -III-

          HSBC argues, and Judge Rivera agrees, that there is a fundamental distinction between what HSBC describes as the "broad scope" of the No Untrue Statement Provision, on the one hand, and the more narrow applicability of the Mortgage Representations set forth in the MLPAs, on the other.  That is, HSBC contends that the No Untrue Statement Provision encompasses transaction-wide documents, while the Mortgage Representations involve loan-specific representations.  We reject that argument, inasmuch as there is no support in the governing agreements for the position of HSBC that the Sole Remedy Provision applies only to occasional mortgage loan-specific breaches, whereas pervasive (or "aggregate") breaches are addressed under the No Untrue Statement Provision. Likewise, contrary to Judge Rivera's assertion in her dissent, the agreements do not provide a carve-out from the Sole Remedy Provision where a certain threshold number of loan breaches are alleged.  Nor do any terms in the No Untrue Statement Provision -- or anywhere else in the agreements -- nullify the Sole Remedy Provision for breaches of the section 8 Mortgage Representations by allowing a general contract damages claim where multiple, systemic breaches of those representations are alleged.

In arguing to the contrary, HSBC and Judge Rivera rely on language in the No Untrue Statement Provision that the materials prepared and furnished by defendant pursuant to the agreement, <u>taken in the aggregate</u>, do not contain any untrue statement of material fact. That reliance is misplaced. The "taken in the aggregate" language does not relieve HSBC from the Sole Remedy Provision; nor does it create the type of "loan pool-level" representations that HSBC claims are distinct from "loan-level" representations. Rather, the clause is a general provision stating that the documents, taken together, do not contain material misstatements and are not materially misleading. In any event, the Sole Remedy Provision, by its very terms, applies to all breaches of the section 8 Mortgage Representations, and HSBC is complaining only of breaches of those representations. Therefore, HSBC is expressly limited to the more specific Sole Remedy Provision negotiated by the parties, however many defective loans there may be (<u>see</u> <u>William Higgins & Sons v State of New York</u>, 20 NY2d 425, 428 [1967]).

Notably, defendant does not claim that all possible breaches of the general representations and warranties set forth in section 7 of the MLPAs, including the No Untrue Statement Provision, are subject to the sole remedy of curing or repurchasing the defective loans. Nor does defendant assert that the Sole Remedy Provision would apply to limit the remedies available for breach of section 7 representations that are not

based on the mortgage loans and their characteristics, such as, for example, a claim that defendant entered into the contract without proper corporate authority.  Rather, defendant concedes that the Sole Remedy Provision would not apply to such breaches based upon the language to which the parties agreed (cf. Ambac Assur. Corp. v EMC Mtge. LLC (121 AD3d 514 [1st Dept 2014]).[5] However, as previously noted, there are no allegations in the complaints of a breach of the No Untrue Statement Provision in section 7 of the MLPAs to which the Sole Remedy Provision would not apply because all of the claims asserted under section 7 are also breaches of the loan-specific Mortgage Representations contained in section 8.

Finally, contrary to the contentions of HSBC and Judge Rivera, the additional language in section 13 of the MLPAs -- providing that remedies are cumulative -- does not remove HSBC's complaints from the ambit of the Sole Remedy Provision.  On its face, section 13 pertains solely to the grant of a security interest in the mortgage loans; it does not address remedies for the breach of representations and warranties.  HSBC's interpretation of this language as authorizing an award of general contract damages for the particular breaches asserted here would render the Sole Remedy Provision meaningless, even for

---

[5] Thus, contrary to Judge Rivera's assertion, the No Untrue Statement Provision is not rendered "relatively meaningless" (Rivera, J. dissenting op at 16).

disputes that fall squarely under the Mortgage Representations section of the MLPAs.  In any event, the more specific Sole Remedy Provision that is narrowly related to breaches of the Mortgage Representations applies here because "[a] specific provision will not be set aside in favor of a catchall clause" (William Higgins, 20 NY2d at 428).

Accordingly, the Appellate Division order insofar as appealed from should be modified, without costs, in accordance with this opinion and, as so modified, affirmed, and the certified question answered in the negative.

Nomura Home Equity v Nomura Credit

No. 39

FEINMAN, J. (dissenting in part):

I concur with the majority insofar as it holds that breaches of representations and warranties that would otherwise be subject to the sole remedy provision cannot escape this provision merely because they are systemic in nature. However,

the majority missteps by assuming that every claimed breach of the No Untrue Statement Provision was simply a breach of section 8 which HSBC had "re-characteriz[ed]" as a breach of section 7 (majority op at 13). Rather, in the Series 2006-FM2 and Series 2007-3 complaints, HSBC does not merely allege "pervasive breach" of the section 8 representations -- which the majority is right to reject -- but also breaches that by their own terms fell outside of the scope of section 8 in the first place.[1]

I.

"On a motion to dismiss under CPLR 3211, the pleading is to be given a liberal construction, the allegations contained within it are assumed to be true and the plaintiff is to be afforded every favorable inference" (Simkin v Blank, 19 NY3d 46, 52 [2012]).

In the Series 2006-FM2 and Series 2007-3 complaints, HSBC alleges that, "[i]n addition to the pervasive breaches of the [section 8] Mortgage Representations, the Investigation revealed that numerous documents assembled and furnished by Nomura to the Trust -- including the Mortgage Loan Files, Mortgage Loan Schedule, and Prospectus Supplement -- are rife with material misrepresentations and omissions" in violation of

---

[1] The non-conclusory allegations in the Series 2006-AF2 and Series 2007-2 complaints were centered on a theory of "pervasive breach" of the Section 8 representations themselves, which the majority properly rejects.

the No Untrue Statement Provision (2006-FM2/2007-3 Compl. ¶ 64).

Specifically, after an investigation of the loans, HSBC

discovered a series of misstatements that fell within three broad

categories. First, the Mortgage Loan Files contained inflated

property appraisal values (see id. ¶ 45), resulting in the loan-

to-value (LTV) and combined loan-to-value (CLTV) ratios in the

Mortgage Loan Schedule and Prospectus Supplement being

understated (see id. ¶¶ 50, 57). LTV/CLTV ratios "represent the

size of the borrower's obligation as compared to the value of the

property securing the loan. . . . All else being equal, the lower

the CLTV (or LTV), the lower the likelihood of default" (id. ¶¶

47, 48). Second, the Mortgage Loan Files and Mortgage Loan

Schedule falsely represented certain loans as being owner-

occupied (see id. ¶¶ 53, 58). "Owner-occupancy is an important

factor in analyzing the credit risk of a particular loan" (id. ¶

51). HSBC's forensic consultants determined whether a property

was "owner-occupied" based on a series of tests, such as whether

the borrower received the property tax bill for the property at

that address, or whether the property was indicated as the

borrower's permanent residence in lien records (see id. ¶ 52). A

property was deemed not "owner-occupied" if it failed two or more

tests (see id. ¶ 53). Third, the Mortgage Loan Files contained

"many misrepresentations of critical facts about borrowers

including misrepresentations of income and employment,

understatement of existing debt obligations, misstatement of the

occupancy status of the property, and misstatements of other basic facts in the Mortgage Loan Files" (id. ¶ 60).

The majority does not contest that these misstatements breached the clear, unambiguous terms of the No Untrue Statement Provision. That provision plainly covers untrue statements of material fact contained in "[t]he written statements, reports and other documents prepared and furnished or to be prepared and furnished by [defendant] pursuant to [the MLPA] or in connection with the transactions contemplated [thereby]" (MLPA § 7 [5]). Instead, the majority states that these misstatements also breached section 8 of the MLPA, to which the sole remedy provision applies. Therefore, according to the majority, plaintiff cannot seek damages for these claims because allowing them to do so would render the sole remedy provision a nullity, contrary to established canons of contractual interpretation.

If this were true, the majority's result would be entirely correct. However, a straightforward reading of the relevant contractual language reveals that the sole remedy provision applies only to specifically-enumerated representations contained in section 8, and these representations do not necessarily duplicate all of the false statements that defendant allegedly furnished HSBC.

## II.

The sole remedy provision does not say that the

repurchase protocol is plaintiff's sole remedy for misrepresentations "with respect to the Mortgage Loans" (majority op at 10). Rather, it says that the repurchase protocol is the sole remedy "respecting . . . a breach of the representations and warranties <u>contained in Section 8</u>" (MLPA § 9 [c] [emphasis added]). The sole remedy provision of the PSA similarly says that the repurchase protocol is the sole remedy "respecting <u>such breach</u>," that is, "a breach of a representation or warranty set forth in . . . Section 8 of the Mortgage Loan Purchase Agreement" (PSA § 2.03 [c] [emphasis added]). Unlike the MLPAs at issue in some other RMBS cases, the sole remedy provision does not simply encompass all material misstatements relating to an individual mortgage loan (cf. <u>Ambac Assur. Corp. v EMC Mortg., LLC</u>, 121 AD3d 514, 518 [1st Dept 2014] [MLPA "provide[d] that the repurchase protocol is the 'sole and exclusive remedy' 'under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans'"]; <u>HSBC Bank USA v Merrill Lynch Mortg. Lending, Inc.</u>, 2016 WL 6582406, at *3 [Sup Ct, New York County, Nov. 3, 2016] [containing a "virtually identical" sole remedy provision to the one in <u>Ambac</u>]). Rather, by its express terms, the sole remedy provision is limited to misrepresentations that breach at least one of the specifically-listed representations in section 8 of the MLPA.

Section 8, in turn, does not purport to include every conceivable representation concerning the mortgage loans that an

investor might find important. Indeed, the Mortgage Loan
Schedule, which contained many of the alleged misstatements
concerning LTV/CLTV ratios and owner-occupancy statements, was
provided to investors "to buttress" these representations (2006-
FM2/2007-3 Compl. ¶ 35). To the extent relevant to the Series
2006-FM2 and Series 2007-3 complaints, section 8 reads as
follows:

> "The Seller hereby represents and warrants to
> the Purchaser that as to each Mortgage Loan
> as of the Closing Date:
>
> 1.      Information provided to the Rating
> Agencies, including the loan level detail, is
> true and correct according to the Rating
> Agency requirements;
>
> 2.      No fraud has taken place on the
> part of the Mortgagor or any other party
> involved in the origination or servicing of
> the Mortgage Loan;
>
> . . .
>
> 8.      Any and all requirements of any
> federal, state or local law including,
> without limitation, usury, truth in lending,
> real estate settlement procedures, consumer
> credit protection, equal credit opportunity,
> fair housing, predatory, fair lending or
> disclosure laws applicable to the origination
> and servicing of the Mortgage Loans have been
> complied with in all material respects, and
> the consummation of the transactions
> contemplated hereby will not involve the
> violation of any such laws;
>
> . . .

14.      There is no material default, breach, violation event or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, and the Seller has not, nor has its predecessors, waived any material default, breach, violation or event of acceleration;

. . .

29.      The Mortgage File contains an appraisal of the related Mortgaged Property which was made prior to the approval of the Mortgage Loan by a qualified appraiser, duly appointed by the related originator and was made in accordance with the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal Practice;

. . .

40.      No Mortgage Loan was selected from the mortgage loans in the Seller's portfolio in a manner so as to affect adversely the interests of the Purchaser;

. . .

42.      Each Mortgage Loan is and will be a mortgage loan arising out of the originator's practice in accordance with the originator's underwriting guidelines;

43.      As of the Closing Date, the Seller has no knowledge of any fact that should lead it to expect that the Mortgage Loan will not be paid in full when due;

. . . ."

(MLPA § 8; see 2006-FM2/2007-3 Compl. ¶ 27).[2]

Just as important as what section 8 says is what it does not say. Unlike some other MLPAs, section 8 does not contain a direct representation that the Mortgage Loan Files, Mortgage Loan Schedule or other loan-specific information sent to the purchaser is true and accurate (cf. Morgan Stanley Mortgage Loan Trust 2006-14SL v Morgan Stanley Mortgage Capital Holdings LLC, 2013 WL 4488367, at *2 [Sup Ct, New York County, Aug. 16, 2013]; Homeward Residential, Inc. v Sand Canyon Corp., 2014 WL 2510809, at *2 [SD NY May 28, 2014]). Nor does section 8 contain a representation as to the accuracy of the Prospectus Supplement (cf. Ambac, 121 AD3d at 518; HSBC Bank USA, 2016 WL 6582406, at *3). Finally, section 8 does not warrant anything about the loan-level data alleged to have been misrepresented, such as owner-occupancy status or LTV and CLTV ratios (cf. Blackrock Core Bond Portfolio v U.S. Bank National Association, 165 F Supp 3d 80, 85 [SD NY 2016] ["Among the representations and warranties of the seller in the MLPA are the following: . . . the mortgaged properties are lawfully occupied as the principal residences of

---

[2] This numbering is based on the Series 2006-FM2 MLPA; the Series 2007-3 MLPA contains identical provisions, though the numbering is different. "Seller" refers to defendant, as the Sponsor of the securitizations. The "Purchaser" is the Depositor, whose interests under the MLPA -- including the benefit of the representations and warranties therein -- were transferred to plaintiff, as trustee (see PSA § 2.01).

the borrowers unless specifically identified otherwise; . . . [and] no loan has a loan to value ratio ('LTV') of more than 100%"]). In short, nothing in section 8 states that all of the loan-level information provided to plaintiff -- such as the LTV/CLTV ratios, owner-occupancy and borrower-specific data set forth, as applicable, in the Mortgage Loan Files, Mortgage Loan Schedule and Prospectus Supplement -- is true. It is section 7, and section 7 alone, that furnishes such a warranty.

It is true that, as the majority explains, a breach of section 8 can be inferred from the presence of such a misstatement. However, that does not make it the same breach. HSBC alleged, for instance, that, based on the inflated property appraisals, there was "strong reason" to believe that the appraisals were "biased and not independent" and therefore did not conform either to federal guidelines or to the Uniform Standards of Professional Appraisal Practice, breaching MLPA § 8 (29) (2006-FM2/2007-3 Compl. ¶ 45). But this is just an inference; the mere presence of those inflated property values does not categorically mean that the appraiser was biased or not independent. Those misstatements can breach section 7 (which prohibits the furnishing of such misstatements) without breaching section 8 (which prohibits the inclusion in the Mortgage Loan Files of nonconforming appraisals), and the first breach is not duplicative of the second.

The majority does not apparently dispute the

observation "that the mere presence of inflated property values, if not based on biased appraisals, could violate the No Untrue Statement Provision and not MLPA § 8 (29)" (majority op at 11-12 [emphasis omitted]). However, the majority suggests that HSBC pleaded itself out of what would otherwise be a valid claim under the No Untrue Statement Provision; i.e., that, to prevail on the claims "actually alleged," HSBC must show that the appraisals were nonconforming (id. at 12). But the claimed breach of MLPA § 8 (29) is not the furnishing of inaccurate appraisals to HSBC; it is the bias and non-independence of the appraisers responsible for them, for which the misstatements in the loan files are but one piece of evidence. HSBC's failure to prevail on its additional claim that the appraisals were nonconforming would not defeat its well-pleaded claim that the inaccuracies in the appraisals themselves violated the No Untrue Statement Provision.

In a similar vein, HSBC infers that the misstated CLTV and owner-occupancy figures indicated a deviation from underwriting standards established in the industry, breaching MLPA § 8 (42) (see 2006-FM2/2007-3 Compl. ¶¶ 57, 58), and that other misstatements in the Mortgage Loan Files "strongly suggest fraud by either or both the Mortgagor and the originator in the underwriting of the loan," in breach of MLPA § 8 (2) (id. ¶ 61). But again, the very presence of those misstatements in the written documents furnished to the trust is a breach of section 7, even if they are the predicate from which a different breach

of section 8 (such as non-conformity with applicable underwriting guidelines, or the presence of fraud) can be inferred.  Indeed, from the pleadings, it appears that some of the misstated CLTV ratios did not rise to the level of a breach of appraisal and underwriting guidelines. In the Series 2006-FM2 loan pool, there were allegedly 1,751 mortgage loans with "materially understated" CLTV ratios, even though only 1,463 of them were so inaccurate that they "warrant[ed] the conclusion that serious errors occurred in the appraisal process" in violation of MLPA § 8 (42) (2006-FM2 Compl. ¶¶ 50, 57).

In addition, plaintiff alleges that, inasmuch as the understated LTV/CLTV ratios and inaccurate owner-occupancy statements were provided to the rating agencies through their inclusion in the Mortgage Loan Schedule and (as to the LTV/CLTV ratios) the Prospectus Supplement, defendant violated MLPA § 8 (1) (see 2006-FM2/2007-3 Compl. ¶¶ 50, 53). But the delivery of such false statements to the rating agencies prior to closing is an entirely separate act from its delivery to the trust, and the mechanism by which the trust is harmed in each case is different. While the Mortgage Loan Schedule is provided to investors to support the section 8 representations, it is provided to the rating agencies as a basis for the rating assigned to the RMBS, which ultimately influences the price at which they are sold (see

id. ¶ 35).[3]

---

[3] The majority's concern that this reading of HSBC's pleadings is "untethered" from the parties' contentions during the course of this litigation is unfounded. The complaints explicitly pleaded that defendant made false statements, not only in MLPA § 8, but in the documents furnished to the trust themselves:

> **"D.  Breaches of the No Untrue Statement Covenant**
>
> 64.  In Section 7(5) of the MLPA, Nomura represented that '[t]he written statements, reports and other documents prepared and furnished or to be prepared and furnished pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading.' **In addition to the pervasive breaches of the [section 8] Mortgage Representations,** the Investigation revealed that numerous documents assembled and furnished by Nomura to the Trust -- including the Mortgage Loan Files, Mortgage Loan Schedule, and Prospectus Supplement -- are rife with material misrepresentations, misstatements and omissions"

(2006-FM2 Compl. ¶ 64 [emphasis added]; accord 2007-3 Compl. ¶ 64). This "[i]n addition to" language alerts us that HSBC is not merely grounding its No Untrue Statement Provision claims on a theory of "pervasive breach" of section 8, but also on the misstatements furnished to it in the accompanying documentation, which misstatements are described elsewhere in the pleadings (see 2006-FM2/2007-3 ¶¶ 45, 50, 53, 57, 58, 60 [describing loan-level inaccuracies]; see also id. ¶¶ 5, 47, 50, 60 [explaining that the data alleged to have been misrepresented are contained in the Mortgage Loan Files, Mortgage Loan Schedule and Prospectus Supplement]; ¶ 35 ["The No Untrue Statement Covenant applies to, among many other things, the Mortgage Loan Files and the Mortgage Loan Schedule, both of which were critical components of the

Securitization"]).

This argument was considered by Supreme Court insofar as its dismissal orders incorporated its earlier decision in <u>Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2006-S4 v Nomura Credit & Capital, Inc.</u> (2014 WL 2890341 [Sup Ct, New York County, Jun. 26, 2014]; <u>see Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.</u>, 2014 WL 12698722 [Sup Ct, New York County, Jul. 17, 2014] [dismissing the third cause of action "(o)n the authority and reasoning relied on" in <u>Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2006-S4</u>]; <u>Nomura Home Equity Loan, Inc., Series 2007-3 v Nomura Credit & Capital, Inc.</u>, 2014 WL 12698720 [Sup Ct, New York County, Jul. 17, 2014] [same]).

> "The complaint does not allege any breach of the No Untrue Statement provision that was not also a breach of the Mortgage Representations to which the sole remedy provisions apply. Rather, the complaint pleads that pervasive breaches of the Mortgage Representations breached the No Untrue Statement Provision. **The only other alleged breach of the No Untrue Statement provision is that 'the Mortgage Loan Schedule did not contain true and accurate loan-level information regarding the Mortgage Loans.'** As described in the complaint, however, the Mortgage Loan Schedule 'identifies and provides detailed information about the characteristics of each Mortgage Loan, including the loan-to-value ratio, occupancy status, and borrower's credit score.' The statements in the Mortgage Loan Schedule about the characteristics of the mortgage loans thus duplicate the Mortgage Representations about the characteristics of the loans"

(<u>Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2006-S4</u>, 2014 WL 2890341, at *12 [emphasis added] [citations omitted]). As explained above, however, this reasoning was based on a flawed reading of the MLPAs at issue here, as statements concerning LTV ratios, occupancy status and credit score do not

"Historically, we have been 'extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include'" (ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581, 597 [2015], quoting Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004]). A contractual provision limiting certain enumerated remedies should not be expanded to preclude other remedies not enumerated (see Biotronik A.G. v Conor Medsystems Ireland, Ltd., 22 NY3d 799, 805 [2014]). Under the well-settled canon of *expressio unius est exclusio alterius* (see Quadrant Structured Products Co., Ltd. v Vertin, 23 NY3d 549, 560 [2014]; Two Guys from Harrison-N.Y., Inc. v S.F.R. Realty Associates, 63 NY2d 396, 403-404 [1984]; Woodmere Academy v Steinberg, 41 NY2d 746, 751 [1977]), and in the absence of any broader language like that in Ambac (121 AD3d at 518), the sole remedy clause applies to every claim arising under a specific subsection of section 8, but not to those that merely fall within that section's penumbras.

The majority's holding puts similarly-situated

---

necessarily "duplicate" section 8.

HSBC raised this point in its brief before this Court (see Resp. Br. at 18-19) and at oral argument, citing specifically to paragraph 64 of the 2006-FM2/2007-3 complaints (reproduced above) when asked where HSBC alleged a breach of section 7 that was not also a breach of section 8.

plaintiffs in an unenviable dilemma. If they plead too little, they may not be able to make out a breach of section 8 or avail themselves of the repurchase protocol, as "bare legal conclusions" are not entitled to consideration (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 141 [2017]). If they plead too much, they will have boxed themselves out of an otherwise valid claim under the No Untrue Statement Provision, though the claim could be supported by a reasonable view of the facts. Even though HSBC may have been furnished with misstatements that breached section 7 but not section 8, and even though HSBC affirmatively pleaded that these misstatements violated section 7, the majority's holding today leaves it without a remedy for those misstatements. As a matter of doctrine, this position is untenable.

Accordingly, HSBC adequately pleaded breaches of the No Untrue Statement Provision that do not duplicate breaches of section 8, and which should therefore survive defendant's motion to dismiss (see Campaign for Fiscal Equity, Inc. v State, 86 NY2d 307, 318 [1995] ["If we determine that the plaintiffs are entitled to relief on any reasonable view of the facts stated, our inquiry is complete and we must declare the complaint legally sufficient"]; accord Aristy-Farer v State, 29 NY3d 501, 509 [2017]).

III.

I would therefore modify so much of the order of the

Appellate Division as denied defendant's motions to dismiss the third cause of action under the Series 2006-FM2 and Series 2007-3 complaints, to permit those claims to proceed solely to the extent that they are not based on statements contained in specific subsections of section 8. I am otherwise in agreement with the majority opinion.

Nomura Home Equity v Nomura Credit

No. 39

RIVERA, J.(dissenting):

Plaintiff, HSBC Bank USA, National Association, as trustee of four residential mortgage loan securitization trusts, sued defendant, Nomura Credit & Capital, Inc., for misrepresentations regarding business practices and certain securitization transactions. Liberally reading those claims, as we must (AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 5 NY3d 582, 591 [2005]), plaintiff sufficiently sets forth allegations that defendant mischaracterized the securitization process in violation of a clause in section 7 of the governing mortgage loan purchase agreements (MLPA), which the parties call the "No Untrue Statement Provision." These allegations are independent and distinct from claims based on specific characteristics and idiosyncracies of any particular individual mortgage loan, which would be subject to the "Sole Remedy Provision" contained in section 8 of the MLPA and

- 1 -

foreclose plaintiff's claims for general damages under the No Untrue Statement Provision.  Contrary to the majority, I conclude that plaintiff's complaints sufficiently plead cognizable claims for damages based on breaches of section 7.

I.

These appeals from four orders involving separate securitizations are yet another installment in a series of lawsuits spawned by the financial crisis that began in 2007.[1] Like many of the lawsuits prior, this involves claims of widespread misrepresentations and bad business practices in the residential mortgage-backed securities (RMBS) industry, behavior that resulted in huge financial losses (see e.g. Oddo Asset Mgmt. v Barclays Bank PLC, 19 NY3d 584 [2012]; Bank of New York Mellon v WMC Mortg., LLC, 151 AD3d 72 [1st Dept 2017]; Loreley Fin. (Jersey) No. 3, Ltd. v Morgan Stanley & Co. Inc., 146 AD3d 683 [1st Dept 2017]; Deutsche Bank Nat. Tr. Co. v Flagstar Capital Markets Corp., 143 AD3d 15 [1st Dept 2016]; U.S. Bank Nat. Ass'n v GreenPoint Mortg. Funding, Inc., 147 AD3d 79 [1st Dept 2016];

---

[1] This consolidated appeal involves four separate actions commenced by HSBC on behalf of four separate mortgage loan trusts trusts known as Series 2006 FM-2, Series 2007-3, Series 2006-AF 2, and Series 2007-2.  The trusts were managed by plaintiff-respondents HSBC on behalf of Nomura Home Equity and Nomura Asset Acceptance Corporation.  Trusts Series 2006 FM-2, Series 2007-3, and Series 2007-2 belong to Nomura Home Equity, and trust Series 2006 AF-2 belongs to Nomura Asset Acceptance Corporation.

Morgan Stanley Mortg. Loan Tr. 2006-13ARX v Morgan Stanley Mortg. Capital Holdings LLC, 143 AD3d 1 [1st Dept 2016]; IKB Int'l S.A. v Morgan Stanley, 142 AD3d 447 [1st Dept 2016]; ACE Sec. Corp. v DB Structured Prod., Inc., 25 NY3d 581 [2015]; Bank of N.Y. Mellon v WMC Mtge., LLC, 136 AD3d 1 [1st Dept 2015], affd 28 NY3d 1039 [2016]; Ambac Assurance Corp. v EMC Mortg. LLC, 121 AD3d 514 [1st Dept 2014]; CIFG Assur. N. Am., Inc. v Goldman, Sachs & Co., 106 AD3d 437 [1st Dept 2013]; MBIA Ins. Corp. v Credit Suisse Sec. (USA) LLC, 103 AD3d 486 [1st Dept 2013]; MBIA Ins. Corp. v Countrywide Home Loans, Inc., 87 AD3d 287 [1st Dept 2011]).  As in numerous RMBS cases, plaintiff alleges misconduct across various, sophisticated investment and banking entities, both domestic and international (see e.g. Morgan Stanley Mortg. Loan Tr. 2006-13ARX v Morgan Stanley Mortg. Capital Holdings LLC, 143 AD3d 1, 8-9 [1st Dept 2016] ["(W)e have recognized that allegations of serious and pervasive misrepresentations regarding the level of risk in an investment with widespread, massive failures will support a claim for contractual gross negligence. In other contexts, we have recognized that this type of alleged conduct in substantially similar investments would support a claim of fraud" (citations omitted)]).

     The instant appeals involve the securitization of RMBS by defendant.  Securitization is a method by which several mortgage loans are transferred into a trust that issues debt securities to investors.  As underlying mortgages are paid off by

their respective borrowers, the proceeds are used to make payments on the debt securities issued to investors in accordance with a priority scheme provided for in the securitization documents. The process begins with banks lending to individual borrowers. Next, a "Sponsor" reviews the loan origination files (including borrowers' applications), selects and acquires loans, and sells those loans to an entity known as the "Depositor." The sale agreement between the Sponsor and the Depositor is known as a Mortgage Loan Purchase Agreement (MLPA). The Depositor transfers (or "deposits") the loans into a trust -- which is controlled by a "Trustee" for the benefit of its security holders -- in exchange for debt securities in the trust. The agreement governing the Depositor's transfer of the loans to the trust in exchange for debt securities is the "Pooling and Service Agreement" or "PSA," which is entered into between, among other parties, the Sponsor, Depositor and Trustee. Ultimately, the Depositor sells the debt securities (known as certificates) to investors (the certificate holders) (Nomura Home Equity Loan, Inc. v Nomura Credit & Capital, Inc., 133 AD3d 96, 99 [1st Dept 2015]; Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v DB Structured Products, Inc., 5 F Supp 3d 543, 547-48 [SD NY 2014]).

Investors, as certificate holders, thereby receive distributions of principal and interest income collected on the mortgage loans held by the trust. Securitization thus enables

financial diversification and transfer of risk from mortgage
lenders to investors. By pooling loans, securitization can make
for an attractive investment. However, investors rely on the
sponsor's warranties and representations -- as the entity
responsible for assessing and selecting the loans to be included
in the trust -- to ensure that the loan pools are as they purport
to be.[2] Indeed, the purpose of securitization is to convert
loans with their attendant individualized risks, into tradeable
securities. Plaintiff's complaints must be considered in the
context of this market reality.


## II.

Defendant is the sponsor of four mortgage loan trusts
in these appeals. Plaintiff is the trustee of each of those
trusts and, under each applicable PSA, the assignee of the
depositor's rights under the MLPA "to the extent of the Mortgage
Loans sold" in connection with the applicable trust. Plaintiff
sued defendant for breaches of the MLPA and PSA associated with
each trust, including causes of action for damages for breach of

---

[2] "Secondary market purchasers also demand contractual
protections to mitigate the [high-risk loans] problem . . .
[I]nstitutional investors usually have to make snap judgments
whether to invest without time for any substantive due diligence;
most simply rely on lenders, underwriters, and rating agencies"
(Kathleen C. Engel & Patricia A. McCoy, Turning A Blind Eye: Wall
Street Finance of Predatory Lending, 75 Fordham L. Rev. 2039,
2061, 2068 [2007] [citation omitted]).

section 7 of the MLPAs.  Defendant moved to dismiss the complaints pursuant to CPLR 3211 (a)(1) and (7).  Supreme Court granted defendant's motions to dismiss with respect to the causes of action for damages under section 7 of the MLPA (see Nomura Home Equity Loan Inc., Series 2007-3 v Nomura Credit & Capital, Inc., 2014 WL 12698720 [Sup Ct, New York County, July 17, 2014]; Nomura Home Equity Loan Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 2014 WL 12698722 [Sup Ct, New York County, July 17, 2014]; Nomura Asset Acceptance Corp., Mortgage Pass-Through Certificates, Series 2006-AF2 v Nomura Credit & Capital, Inc., 2014 NY Slip Op 33609[U] [Trial Order], 2014 WL 10646128 [Sup Ct, New York County, July 18, 2014]; Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-2 v Nomura Credit & Capital, Inc., 2014 NY Slip Op 32604[U] [Trial Order], 2014 WL 5243512 [Sup Ct, New York County, July 18, 2014]).  In a consolidated appeal, the Appellate Division modified and affirmed as modified, holding that the motion court erred in disallowing the section 7 claims (see Nomura Home Equity Loan, Inc. v Nomura Credit & Capital, Inc., 133 AD3d 96 [1st Dept 2015]).  I disagree with the majority that those claims should be dismissed.

These appeals involve the interplay of the following sections of the securitization agreements.  Section 7 (5) of the MLPA, the Untrue Statement Provision, assures investors that:

> "This Agreement does not contain any untrue
> statement of material fact or omit to state a
> material fact necessary to make the

statements contained herein not misleading. The written statements, reports and other documents prepared and furnished or to be prepared and furnished by [Nomura] pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading."

Section 8 of the MLPA contains 62 representations and warranties, each of which is made "as to each Mortgage Loan." These include the requirement that Nomura provide rating agencies with correct information (MLPA § 8 [1]), a warranty against a default on an underlying mortgage (MLPA § 8 [14]), and a representation that each mortgage loan was subject to an independent appraisal before it was approved (MLPA § 8 [29]).

Section 9 of the MLPA prescribes remedies in the event of "a breach of any of the representations and warranties contained in Section 8 that materially and adversely affects the value of any Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee" (MLPA § 9 [a]). Under this section, unless defendant can cure the defect within a contractually prescribed period of time, defendant must either repurchase the affected mortgage loan or remove and substitute that mortgage loan from the trust (see id.). Further, "the obligations of [defendant] set forth in this Section 9 to cure or repurchase a defective Mortgage Loan . . . constitute the sole remedies . . . against [defendant] respecting

a missing document or a breach of the representations and warranties contained in Section 8" (id. § 9 [c]).  However, MLPA section 13 states that "[a]ll rights and remedies . . . under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively" (MLPA § 13).

Section 2.03 (b) of the PSA contains customary transaction-wide representations similar to those contained in section 7 of the MLPA (none of which are implicated in this case).  Unlike section 7, however, PSA § 2.03 (b) does not contain a No Untrue Statement Provision.  Instead, section 2.03 (b) of the PSA provides that in the event that a party discovers a breach of the loan-specific representations and warranties set forth in section 8 of the MLPA, or of certain transaction-wide representations in PSA § 2.03 (b), and the breach "materially and adversely affects the interests of the Certificate holders in any Mortgage Loan," defendant must either repurchase or substitute the affected mortgage loan.  As in section 9 of the MLPA, this repurchase-or-substitution covenant "shall constitute the sole remedies . . . respecting such breach."

Unlike section 8 of the MLPA and section 2.03 (b) of the PSA, which specifically limit remedies for claims arising from violations of the warranties within those provision, section 7 has no such limitations on its remedy or scope.  It clearly

covers any and all misrepresentations related to the entire agreement, meaning the entire transaction.  Thus, as is undisputed by the parties, where there is a breach of the representations and warranties of section 8 concerning an individual mortgage loan, plaintiff is limited to the sole remedy of cure or repurchase.  Yet that remedy is not exclusive of other available remedies for different breaches of the securitization agreement.


                              III.

A.  <u>Applicable Legal Standards on Defendant's Motion to Dismiss</u>

          In assessing the adequacy of a "motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction.  We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (<u>Leon v Martinez</u>, 84 NY2d 83, 87-88 [1994] [citation omitted]); <u>see</u> <u>also</u> <u>AG Capital</u>, 5 NY3d at 591 [internal quotation marks and citations omitted]; <u>Al-Rushaid v Pictet & Cie</u>, 28 NY3d 316, 327 [2016]).  "Unlike on a motion for summary judgment, where the court 'searches the record and assesses the sufficiency of the parties' evidence,' on a motion to dismiss the court 'merely examines the adequacy of the pleadings'" (<u>Davis v Boeheim</u>, 24 NY3d 262, 268 [2014], quoting

State of New York v Barclays Bank of N.Y., 151 AD2d 19, 21 [3d Dept 1989], aff'd 76 NY2d 533 [1990]).  Whether the plaintiff "can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]), and therefore a plaintiff opposing a motion to dismiss need not prove entitlement to recovery.

The moving party carries a heavy burden in a CPLR 3211 (a) (1) claim, as it cannot prevail unless "the documentary evidence conclusively refutes plaintiff's . . . allegations" (AG Capital, 5 NY3d at 591 [reversing grant of motion to dismiss]; see also J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334-335 [2013]), "conclusively establish[ing] a defense to the asserted claims as a matter of law" (Carlson v American Int'l Grp., Inc., No. 47, 2017 WL 5557948 [2017] [holding defendants failed to show plaintiff had not "manifest(ed) any cause of action cognizable at law" or submitted "documentary evidence (to) conclusively establish a defense to the asserted claims as a matter of law" to satisfy 3211 (a) (1) (citations omitted)]). Further, in assessing motions pursuant to CPLR 3211 (a) (7), "any deficiencies in the complaint may be amplified by supplemental pleadings and other evidence" (AG Capital, 5 NY3d at 591 [citation omitted]), as "the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one" (Carlson, No. 47, 2017 WL 5557948, quoting Leon, 84 NY2d at

88).  Courts should deny motions to dismiss in breach-of-contract claims as premature when factual development may impact their resolution (see e.g. J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324 [2013] [reversing dismissal of a breach-of-contract claim because application of defense depended on the facts]).

Here, plaintiff alleges various breaches of the securitization agreements.  Under our well-established rules of contract interpretation, courts look to the plain language of contracts when interpreting their meaning (see Metropolitan Life Ins. Co. v Noble Lowndes Int'l, Inc., 84 NY2d 430 [1994]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]).  A contract should be read as a fully integrated whole, with no provision rendered meaningless (see Bombay Realty Corp. v Magna Carta, Inc., 100 NY2d 124, 127 [2003] ["All parts of a contract must be read in harmony to determine its meaning."]; Ronnen v Ajax Elec. Motor Corp., 88 NY2d 582, 589 [1996] ["We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect."]).  "Where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect" (Meehan v County of Suffolk, 144 AD3d 642, 644 [2d Dept 2016]; accord National Conversion Corp. v Cedar Bldg. Corp., 23 NY3d 621, 626 [1969] ["All parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency."]).

B.  <u>Plaintiff's MLPA § 7 Transaction-Wide Misrepresentation</u>

<u>Claims</u>

Plaintiff asserts that it sufficiently alleges a violation of the No Untrue Statements Provision of section 7 in connection with all four securitizations.  It further claims that due to the violations, it may seek damages sounding in breach of contract.  The majority rejects this view of the complaints and instead adopts defendant's argument that plaintiff's claims amount to violations of section 8, rather than section 7.  As such, plaintiff would be limited to the sole remedies of repurchase or cure (majority op at 11).  I disagree.  Plaintiff's allegations of transaction-wide misrepresentations concerning the respective loan pools are not mere duplicative recitations of breaches of section 8 warranties and representations.  Instead, plaintiff's section 7 claims concern defendant's characterizations, through its statements and documentation, of the securitizations as suitable investment opportunities, the reliability of defendant's business practices, and the nature and quality overall of the loan pools.  The misrepresentations alleged by plaintiff as violations of the No Untrue Statement Provision go to the core of the securitizations.

For example, plaintiff alleges transaction-wide misrepresentations and misleading omissions in certain documents furnished by defendant as part of the securitization.  These included false statements about defendant's business operations,

loan underwriting, and quality control procedures contained in the Prospectus Supplement, as well as misrepresentations of the loan pool's overall characteristics, owner-occupancy status, and borrower credit scores in the Mortgage Loan Schedule.  Section 7, which assures the investor that the furnished documents contain no untrue statements and that the transactions in the aggregate are not misleading, applies to these documents and the statements contained therein.

Further in support of its claims, plaintiff alleged that the defects in the mortgage loans were so pervasive in nature, numbering in the thousands and constituting between 45 percent and 83 percent of the samples reviewed, that these defects impaired plaintiff's interests in the loan pool as an entirety, in breach of the No Untrue Statement Provision.  For example, plaintiff alleges that "revelations regarding [defendant's] mortgage loan securitization practices indicate," "given the thousands of breaches identified to date and the losses suffered by the Trust," that these "breaches pervade the entire Trust."  One complaint alleges:

> "The massive number of defective loans that Nomura sold to the Trust far exceeds anything contemplated by the agreements.  A handful of breaches (and a handful of cures, substitutions, and/or repurchases) in a pool of 2,717 mortgage loans is perhaps to be expected.  Some 1,600 separate breaches, many of which Nomura discovered prior to closing, are not."

In contrast, section 8 representations and warranties do not assure the absence of systemic problems with the securitization. Nor do some small number of individual defective loans destabilize the loan pools or exponentially enhance the investors' risks, as plaintiff alleges occurred with these securitizations.

Moreover, sections 8 and 9 of the MLPA are both written in the singular and refer exclusively to breaches of the representations and warranties contained in section 8. Section 8 states that the representations and warranties therein apply "as to each Mortgage Loan," while section 9 limits the sole remedies of cure and repurchase of "a defective Mortgage Loan . . . respecting a missing document or breach of the representations and warranties contained in section 8." Section 2.03 of the PSA also provides that the sole remedy is limited to section 8 violations and not to breaches of any other provision: section 2.03(c) refers back to the breach of any representation or warranty in section 8 "that materially and adversely affects the interest of the Certificate holders in any Mortgage Loan." Additionally, section 13 of the MLPA states that "[a]ll rights and remedies of the [Depositor] under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity" (MLPA § 13). This provides for aggregation, and the parties must have anticipated potential claims based on combined misrepresentations and loan

defects.  If the parties meant the sole remedy clause to apply to transaction-wide misrepresentations they would have said so. They did not, and, as a consequence, these sophisticated parties are bound to the language of the contract and their bargained for allocation of risk (Metropolitan Life Ins., 84 NY2d at 436).

Contrary to the majority's assertion, this interpretation of the interplay among the PSA and sections 7 and 8 of the MLPA does not render the sole remedy clause meaningless or superfluous.  The limited remedy contained in that clause is available on an ad hoc, loan-specific basis.  The flaw in the majority's analysis is laid bare by the fact that plaintiff cannot claim a systemic problem with the securitization loan pool by pointing to any particular loan's failure, which of course is necessary to constitute a breach of the warranties and representations in section 8.  Inversely, the fact that widespread loan defects may serve as evidence of plaintiff's transaction-based claims is of no consequence at the pleading stage, where the inquiry is solely whether plaintiff has alleged facts supporting any cognizable theory for relief.  Notably, although the majority's approach would permit claims under section 8, it would render the No Untrue Statement Provision relatively meaningless and perversely incentivize the very abusive business practices that led to the financial crash.

Ultimately, if the risk of the loans in the pool had been correctly calculated, then it would make sense for defendant

to repurchase or replace loans that violate the warranties, as this would be a small number.  Yet, this scheme does not address large scale breaches where defendant intentionally manipulated the risk assessment by waiving in non-conforming loans. Interpreting section 7 to encompass transaction-wide claims furthers the purpose of the securitization because investors would not buy in if they could not rely on defendant's business practices to adequately document and assess risk.

As plaintiff asserts:

"Given its unique vantage point as the securitization sponsor with control over which of the loans were selected and with access to the underwriting information pertaining to each such loan, Nomura was the *only* transaction party that was in a position to accept the risks associated with defects in the Mortgage Loans, including defects in the underwriting process itself.  Moreover, it was market practice for responsible parties -- such as the securitization sponsor -- to accept those risks, and Nomura did so."

Without assurances as to the characteristics and quality of the individual loans, the overall market strength of the loan pools, and the nature of the practices governing the securitization process, investors would not purchase the debt securities: because "investors were unable to conduct loan-by-loan due diligence before purchasing the Certificates," if Nomura had not warrantied the pools, "the Securitization would not have been consummated as investors had no other means to independently verify the quality of the Mortgage Loan collateral."

## C.  Plaintiff's Other MLPA § 7 Claims

I join section II of Judge Feinman's dissent and agree with his comprehensive analysis of the section 7 claims that are not subject to the Sole Remedy Provision.  Even under the majority's interpretation of the MLPA and PSA, several of the loan-level claims alleged by plaintiff fall outside the scope of the Sole Remedy Provision. Specifically, plaintiff alleges that, "[i]n addition to the pervasive breaches of the [section 8] Mortgage Representations, the Investigation revealed that numerous documents assembled and furnished by [defendant] to the Trust -- including the Mortgage Loan Files, Mortgage Loan Schedule, and Prospectus Supplement -- are rife with material misrepresentations and omissions" in violation of the No Untrue Statement Provision.  Additionally, plaintiff asserts that the Mortgage Loan Files contained "many misrepresentations of critical facts about borrowers including misrepresentations of income and employment, understatement of existing debt obligations, misstatement of the occupancy status of the property, and misstatements of other basic facts in the Mortgage Loan Files" (id. ¶ 60).

Contrary to the majority's narrow interpretation of the complaint (majority op at 9-11), such claims may be read as asserting breaches of section 7 that do not necessarily breach the representations and warranties contained in section 8. Neither law nor logic support the majority's contention that the

assertion of this category of section 7 claims would render it impossible for plaintiff to establish a claim based on a section 8 breach (majority op at 11). As Judge Feinman explains in detail, plaintiff alleges statements that are untrue but that may not breach a section 8 representation as well (Feinman, J. dissenting op at 4-15).[3] These are sophisticated parties, who would not have included section 7 if it merely repeated the representations of section 8, nor, by the majority's reading, foreclosed a claim based on an untrue statement in order to preserve a claim under section 8. The majority's antagonistic interpretation is contrary to our pleading rules and ignores that the parties could not have set forth every potential untrue statement in section 8's warranties.

It is impossible at the pleading stage to determine whether plaintiff will prove these section 7 claims. Nevertheless, on a motion to dismiss the question is not whether plaintiff will ultimately prevail but whether plaintiff has alleged a cognizable claim (Carlson, No. 47, 2017 WL 5557948). "If the court finds that the plaintiff is entitled to recover upon any reasonable view of the stated facts, its inquiry is

---

[3] For example, as Judge Feinman discusses (Feinman, J. dissenting op at 9), the plaintiff claims there was "strong reason" to believe that the property appraisals were "biased and not independent" because the appraisals were inflated. While the mere inclusion of inflated property values would breach section 7, only if the appraiser were actually biased or not independent would section 8 (which prohibits the inclusion of biased appraisals in the Mortgage Loan Files) be breached.

complete and it must declare the complaint to be legally sufficient" (219 Broadway Corp. v Alexander's, Inc., 46 NY2d 506, 509 [1979]; see also Davis v Boeheim, 24 NY3d 262, 268 [2014]). Therefore, affording the pleading a liberal construction, accepting the facts alleged as true, and according plaintiff the benefit of every possible favorable inference, plaintiff has sufficiently asserted a claim for relief based on alleged untrue statements contained in various documents submitted to the Trust. Since defendant failed to "conclusively establish[] a defense to the asserted claims as a matter of law" (Carlson, No. 47, 2017 WL 5557948 [citation omitted]), it was error to dismiss plaintiff's causes of action for damages based on alleged breaches of section 7 that are distinct from breaches of section 8.

IV.

For the reasons I have discussed, plaintiff's claims for relief from violations of the No Untrue Statement Provision are properly pleaded. The Appellate Division order should be affirmed, and the certified question answered in the affirmative.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order, insofar as appealed from, modified, without costs, in accordance with the opinion herein and, as so modified, affirmed and certified question answered in the negative. Opinion by Judge Stein. Judges Fahey, Wilson, Centra and Balkin concur. Judge Feinman dissents in part in an opinion, in which Judge Rivera concurs in part in a separate dissenting opinion. Chief Judge DiFiore and Judge Garcia took no part.

Decided December 12, 2017