Home Equity
Mortgage Trust Series 2006-1, HOME EQUITY MORTGAGE TRUST SERIES 2006-3, and
HOME EQUITY MORTGAGE TRUST SERIES 2006-4, by U.S. BANK NATIONAL
ASSOCIATION, solely in its capacity as Trustee, Plaintiffs,

against
DLJ Mortgage Capital, Inc. and SELECT PORTFOLIO
SERVICING, INC., Defendants.

HOME EQUITY MORTGAGE TRUST SERIES 2006-5, by U.S. BANK
NATIONAL ASSOCIATION, solely in its capacity as Trustee, Plaintiff,
against
DLJ MORTGAGE CAPITAL, INC. and SELECT PORTFOLIO
SERVICING, INC., Defendants.

156016/2012

Saliann Scarpulla, J.

In this residential mortgage backed securities ("RMBS") action for, inter alia, breach
of contract, defendant DLJ Mortgage Capital, Inc. ("DLJ") moves, pursuant to CPLR 3212, for
partial summary judgment (Index No. 156016/2012, motion sequence number 33; Index No.
653787/2012, motion sequence number 31). Plaintiffs Home Equity Mortgage Trust Series
2006-1, 2006-3, 2006-4 and 2006-5 ("Home Equity" or "plaintiffs") move, pursuant to CPLR
3212, for partial summary judgment (Index No. 156016/2012, sequence number 32; Index No.
653787/2012, sequence number 30). These motions are consolidated for disposition.
This litigation relates to four trusts created in 2006 pursuant to four Pooling and Servicing
Agreements ("PSAs") between DLJ, as the Seller, and U.S. Bank National Association, as the
Trustee. On the closing dates, the Trusts, HEMT 2006-1 Trust, HEMT 2006-3 Trust, HEMT
2006-4 Trust and HEMT 2006-5 Trust, contained 35,909 securitized residential mortgage loans
that were originated or acquired by DLJ. The mortgage loans were packaged into [*2]these Trusts, which issued debt securities that were sold to
investors. The HEMT 2006-1 transaction closed on February 28, 2006, HEMT-3 closed on June
30, 2006, HEMT-4 closed on August 30, 2006, and HEMT 2006-5 closed on October 21,
2006.
DLJ is a wholly-owned subsidiary of Credit Suisse Holdings (USA) LLC ("Credit Suisse
LLC"). DLJ, the entity through which Credit Suisse acquired and sold residential mortgage
loans, acquired mortgage loans, and transferred them to Credit Suisse First Boston Mortgage
Securities Corp. ("Credit Suisse"), the Depositor under the PSA, which then transferred the
mortgage loans into the Trusts through the execution of the PSAs.
Most of the mortgage loans were secured by second liens on the underlying mortgaged
property, balloon loans, and reduced documentation loans. Income or assets, or both, were not
verified at origination for reduced documentation loans in the Trusts. The loans were originated
by many different originators, and underwritten pursuant to different guidelines. Bruce
Kaiserman, then managing director of Credit Suisse, testified at a deposition that Credit Suisse
used the following attributes to determine the risk of the loans: "interest rate, the loan amount,
the state, the property type, the occupancy type, the DTI, the LTV, the number of trade lines, the
length of those trade lines, the purpose of the loan. If it was a refinance, whether there was cash
out, the lien of the loan" (Rugani affirmation, exhibit 26 at 104).
As in all RMBS put-back actions, the PSAs govern the structure of the transaction and the
parties' rights. Each PSA contains representations and warranties, set forth under Section 2.03
(f). In Section 2.03 (f), DLJ made several warranties as of the PSAs closing dates: "The Seller
hereby makes the representations and warranties set forth in Schedule IV as applicable hereto,
and by this reference incorporated herein, to the Trustee, as of the Closing Date, or the
Subsequent Transfer Date, as applicable, or if so specified therein, as of the Cut-off Date or such
other date as may be specified." Schedule IV of each PSA contains twenty-five representations
and warranties relating to the mortgage loans in the Trusts. Under each PSA, the parties agreed
to a process for the repurchase of loans that breached those representations and warranties. ("the
repurchase protocol").
The controlling repurchase protocol is set forth in section 2.03 (g) of the PSAs, which states:
"Upon discovery by any of the parties hereto of a breach of a representation or warranty made
pursuant to Section 2.03 (f) that materially and adversely affects the interests of the
Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt
notice thereof to the other parties."
DLJ had one hundred and twenty days from either "its discovery or its receipt of written
notice [of the breach] from any party" to the PSA, to either cure the breach, or if the breach is not
cured, to "repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the
Repurchase Price . . .."
The Repurchase Price is defined under the PSAs as the "sum of (i) 100% of the unpaid
principal balance of the Mortgage Loan on the date of such purchase, and (ii) accrued unpaid
interest thereon at the applicable Mortgage Rate . . .."[FN1]
 
In a November 22, 2011 letter, the Trust notified DLJ of breaches of representations and
[*3]warranties in the Trusts and demanded cure or repurchase
under Section 2.03 (g) of the PSAs. The letter informed DLJ of the samples of loans that had
been investigated, and the numbers of breaches discovered therein, and stated that an
investigation of samples of loans revealed that DLJ "placed defective loans into the Trusts on a
massive scale." The letter identified: (1) 288 defective loans, or 70.9%, from a sample of 406
loans in the HEMT 2006-1 Trust; (2) 522 defective loans from a sample of 721 loans, or 72.4%,
in the HEMT 2006-3 Trust; (3) 359 defective loans from a sample of 553 loans, or 65%, in the
HEMT 2006-4 Trust; and (4) 284 defective loans from a sample of 395 loans, or 72%, in the
HEMT 2006-5 Trust." [FN2]

The letter further notified DLJ that the Trust's investigation was ongoing, and an even higher
rate of breaches was expected to be discovered by plaintiffs' investigators. Specifically, the letter
provided: "the sample represents just the tip of the iceberg. [We are] confident that additional
investigation, including a re-underwriting of the loan files themselves, will reveal substantial
additional evidence of breaches." The letter also indicated that "recent public investigations have
revealed that DLJ mortgage pervasively and systematically disregarded its own underwriting
guidelines and, as a result, issued mortgages that did not meet stated criteria in the offering
documents; and (2) loan file reviews by insurers of transactions that included DLJ
Mortgage-sponsored loans have demonstrated pervasive breaches of underwriting
standards."
On December 7, 2011, U.S. Bank, N.A., as Trustee, sent a letter demanding the repurchase
of 288 loans from the HEMT 2006-1 Trust, 522 loans from the HEMT 2006-3 Trust, 359 loans
from the HEMT 2006-4 Trust, and 284 loans from the HEMT 2006-5 Trust. On April 27, 2012,
the Trustee sent a letter to DLJ demanding the repurchase of 510 loans from the HEMT 2006-1
Trust. On August 22, 2012, the Trustee sent a letter to DLJ demanding the repurchase of 244
loans from the HEMT 2006-3 Trust, and 42 loans from the 2006-4 Trust. On December 14, 2012,
the Trustee sent a letter demanding the repurchase of 20 from the HEMT 2006-5 Trust. On
February 27, 2013, the Trustee sent a letter demanding the repurchase of 235 loans from the
HEMT 2006-5 Trust. On November 19, 2013, the Trustee sent a letter demanding the repurchase
of 2,563 loans in the HEMT 2006-4 Trust. On May 28, 2014, the Trustee sent a letter to DLJ
demanding the repurchase of 4,056 loans in the 2006-5 Trust.
Plaintiffs allege that DLJ has not repurchased any loans in response to plaintiffs' demand
letters. 
On February 22, 2012, DLJ, Credit Suisse (USA), Inc., Credit Suisse Securities (USA) LLC,
and the Trustee signed a tolling agreement, tolling the statute of limitations for all claims the
Trusts had concerning the HEMT 2006-1, 2006-3 and 2006-4 transactions. This tolling
agreement was signed on February 28, 2012, seven days before the sixth anniversary of the date
on which the earliest of the PSA's, HEMT 2006-1, was executed. The tolling agreement
provided that its termination date would be the earlier of: "(1) 45 calendar days after any one or
more parties sends all other parties written notice of termination; or (2) the date that is exactly
twelve months from the Effective Date." DLJ terminated the tolling agreement on July 12, 2012,
and the Trusts commenced this lawsuit concerning those three trusts on August 31, 2012.
In its complaint under index number 156016/2012, Home Equity alleged five causes of
action against DLJ, three of whichbreach of contract: repurchase damages, breach of
contract: failure to reimburse enforcement expenses, and unjust enrichmentsurvived
DLJ's motion to dismiss. The same three claims, pertaining to the HEMT 2006-5 Trust, survived
DLJ's motion to dismiss Home Equity's complaint under index number 653787/2012.
Notice of Breaching Loans
Home Equity asks me to rule as a matter of law on the "meaning of the Repurchase
Protocol's procedural requirement that DLJ discover or be notified of breaches." Specifically,
Home Equity asks me to hold, as a matter of law, that DLJ received notice of all defective loans
included in all four trusts on November 22, 2011, the date of the initial demand letter, under a
pervasive breach theory. 
Home Equity argues that notice under the repurchase protocol need not be loan-by-loan,
because individualized notice or actual knowledge of breaches is not required to make DLJ aware
of a breach affecting any mortgage loan. Rather, Home Equity argues, its notification of a
pervasive number of breaches in an RMBS loan pool, its loan-by-loan analysis of breaches in
specific sampled loans, and its demand that DLJ repurchase all breaching loans, put DLJ on
timely notice of all non-conforming loans.
In opposition, DLJ argues that the repurchase protocol limits recovery to those specific loans
for which DLJ received notice or discovered breaches. According to DLJ, under the plain
language in Section 2.03 (g), the repurchase obligation is loan-by-loan, as it is contingent upon
"the affected Mortgage Loan," and "its discovery or its written notice of a breach" that has a
material and adverse effect. DLJ argues, "thus, to obtain repurchase of a specific loan at the
contractually defined loan-specific price, the PSAs unambiguously require that DLJ be notified
of a breach, or discover a breach, for that loan."
On its motion, DLJ argues that plaintiffs provided timely notices of possible breaches for
1,351 loans in their pre-suit demand letters. DLJ argues that of the loans selected by plaintiffs'
experts, Karl N. Snow PhD ("Snow") and Richard W. Payne III ("Payne"), for sampling, only 34
were included in the timely notices. DLJ argues, therefore, that plaintiffs may seek damages for
only 34 of these loans, as the remainder were not included in the pre-suit notices.
In Nomura Home Equity Loan, Inc.,
Series 2006-FM2 v. Nomura Credit & Capital, Inc., (133 AD3d 96 [1st Dept. 2015]
affd 30 NY3d 572 [2017]), the First Department addressed, on a motion to dismiss,
substantially similar contract language to that in the PSAs here. The Court held that, based upon
plaintiffs' pre-suit breach notices, the lower court "correctly refused to dismiss claims relating to
loans that plaintiffs failed to mention in their breach notices . . .." Nomura, at 108. This
finding, that plaintiff need not identify every breaching loan for which it seeks recovery in a
pre-suit breach notice, is based upon both the contract language and the language in "plaintiffs'
presuit letters [that] put defendant on notice that the certificate holders whom plaintiffs (as
trustees) represented were investigating the mortgage loans and might uncover additional
defective loans for which claims would be made." Id. at 108. The Court concluded that
where there was such language, and where there were timely claims asserted upon the alleged
specific breaching loans set forth in a breach notice, "a complaint amended to add the claims at
issue would have related back to the original complaints." Id. at 108. 
In Nomura, the First Department did not dispense with the requirement of loan by
loan notice. Rather, the court concluded that consistent with the structure of the repurchase
protocol, breach notices need not all be sent pre-suit, but must reference specific loans. The court
found [*4]that where a party provided timely loan by loan pre-suit
notice of the nonconforming loans, together with notice that further investigation was being
conducted into additional potentially defective loans, that party could later, after commencement
of the action, provide loan by loan notice of additional breaches revealed, because they would
relate back. 
Similarly, in Mastr Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate
Securities Inc., 2016 WL 1449751 [S.D.NY 2016]), the Court addressed the question of
whether to preclude the report of plaintiff's expert wherein the identified loan breaches had not
been specifically identified in the pre-suit breach notices. Relying on Nomura, United
States District Judge P. Kevin Castel permitted the plaintiff to establish liability on loans that
were not noticed in pre-suit demands. In support of his ruling, Judge Castel stated: "UBS cannot
claim prejudice arising from the consideration of the newly noticed breaches. All the underlying
loans were the subject of ongoing discovery, either as breaches alleged to have been
independently discovered by UBS or as breaches identified in the pre-suit beached notices. From
the date that discovery re-opened, UBs was on notice that all loans were potentially in play,
subject to evidence that UBS had actually discovered a breach." Id. at *6.
Here, the repurchase demand letters notified DLJ of specific loan breaches and provided
notice of plaintiffs' ongoing investigation of possible breaches of additional loans. Thus, in
accordance with the language of the repurchase protocol, and consistent with the First
Department's decision in Nomura, the Trust timely notified DLJ of several specific
loan-by-loan breaches, and additionally notified DLJ, based upon those findings, of the
likelihood of additional breaches. 
Home Equity's November 22, 2011 and December 7, 2011 demand letters, timely notifying
DLJ of specific breaches in the mortgage loans, satisfy the prongs of the repurchase protocol and
set the stage for plaintiffs to establish liability as to any loans noticed as alleged breaches of the
PSAs, whether pre-suit or post-commencement of this action. Accordingly, plaintiffs may
proceed to trial on any loan breach that was either included in the timely pre-suit breach notices,
or noticed during discovery, for example, as identified in the expert reports of Karl Snow, PhD,
or Richard W. Payne III. 
Pursuant to the applicable contractual language here, the repurchase protocol could
alternatively be triggered by DLJ's independent discovery of a material breach. See U.S. Bank N.A. v. Greenpoint Mtge.
Funding, Inc., 147 AD3d 79, 85 (1st Dept, 2016). In Nomura, the First
Department also held that, in accordance with the applicable contractual language, a plaintiff
need not provide loan-by-loan notice where the plaintiff could establish discovery on the part of
the defendant. The Court in Nomura relied upon plaintiffs' allegations that "defendant
already knew, based on its own due diligence, that certain loans in the trusts at issue breached its
representations and warranties." Id. at 108. On these motions, sufficient evidence has
been presented to raise an issue of fact as to whether DLJ discovered a breach pursuant to
Section 2.03 (g) of the PSAs.[FN3]
Plaintiffs have the opportunity at trial to establish that, based upon DLJ's own due diligence or
quality control, it discovered the loan breaches, triggering the mechanism under the repurchase
protocol.
Interpretation of the Warranties
In Section 2.03 (f) of the PSAs, DLJ warranted the twenty-five statements in Schedule IV of
the PSAs. In their motion, Home Equity asks me to interpret as a matter of law [FN4]
three of these warranties: the fourth (the Mortgage Loan Schedule Warranty); the fifth (the
Underwriting Guidelines Warranty); and the twenty-fourth (the CLTV Warranty). 
The Mortgage Loan Schedule Warranty
The mortgage loan schedule ("MLS") warranty, states: "The information set forth in the
[MLS], attached to the Agreement as Schedule I, is complete, true and correct in all material
respects as of the Cut-off Date." In the definitions section of the PSA, the MLS is defined as:
"The Mortgage Loan Schedule which will list the Mortgage Loans transferred to the Trustee as
part of the Trust Fund and from time to time subject to this Agreement, attached hereto as
Schedule I, setting forth the following information with respect to each Mortgaged Loan."
This paragraph is followed by a list of twenty-six items, including information such as: the
mortgage loan identifying number, a code indicating the type of Mortgaged Property and
occupancy status, the Combined Loan-to-value Ratio at origination, the original principal amount
of the Mortgage Loan, and the purpose of the Mortgage Loan.
Home Equity argues that the words "complete, true and correct" are an "absolute guarantee
of the truth and accuracy of the information listed on the MLS." In Home Equity's view, for
example, if the original principal amount was a few dollars off that stated in the loan file for the
loan, that in and of itself would establish a breach of the MLS warranty.
In opposition, DLJ argues that the MLS warranty should be read as a transcription warranty,
meaning that the "information on the MLS accurately reflected the information in the loan file as
actually defined and used in underwriting that particular loan." According to DLJ, this language
could not warranty the truth of every piece of data in thousands of loans, and that Home Equity's
interpretation of this warranty does not make sense "where the meaning of 'true' in the context of
fields where data is based on unverified information provided by the borrower is at least
unclear."[FN5]

Recently, in MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC,
(USA) LLC, the First Department held that, with respect to an "MLS Rep." as well as a
"No Monetary Default Rep.," contained in a PSA, "'the better course is to hold a trial to inquire
into and develop the facts to clarify the relevant legal principles and their application to [the]
representations and warranties'." MBIA Insurance Corp. v. Credit Suisse Securities (USA)
LLC, (USA) LLC, 165 AD3d 108, 115 (1st Dept 2018), quoting Ambac Assur. Corp. v.
Countrywide Home Loans Inc., 151 AD3d 83, 89 (1st Dept 2017). MBIA Insurance
Corp. is controlling here. Therefore, I deny Home Equity's motion for partial summary
judgment on the interpretation of the MLS warranty. 
The Underwriting Standards Warranty
Under the PSAs, DLJ warranted that "[t]he Mortgage Loan complies with all the terms,
conditions, and requirements of the originator's underwriting standards in effect at the time of the
origination of such Mortgage Loan." Home Equity argues that the Court should find that this
warranty is an "absolute guarantee the loan complied with all underwriting standards,"
including the underwriter's obligation to consider the reasonableness of the stated income, as well
as the reliability of the property appraisals. 
Home Equity further argues that it may establish a breach of this warranty as a matter of law
whenever the steps and procedures for each are not followed. According to Home Equity, it is
irrelevant that the originators were not under any obligation to verify borrower information such
as income, because the guidelines created a specific duty to investigate where the information
provided by the borrower was suspect under the circumstances. In such a case, Home Equity
contends, DLJ is liable as a matter of law regardless of whether the information was incorrect
due to misrepresentation or fraud.
Home Equity argues that I should hold, as a matter of law, that it may prove a breach of the
underwriting standards warranty by showing "either that an underwriting process was not
followed, e.g., that an underwriter did not verify the reasonableness of a borrower's stated
income, as required by the guidelines, or that a substantive requirement of the
underwriting criteria was not met, for example where a Loan made under a program with a
maximum DTI [FN6]
ratio of 50% in fact had a DTI ratio of 60%."
DLJ agrees with Home Equity that, while the underwriters were not generally obligated to
"verify" borrower information under the applicable guidelines, the only valid interpretation of the
underwriter standards warranty is that DLJ "warrants that the loan was underwritten to the
underwriting guidelines in effect at the time of origination—i.e., that the underwriter
properly followed the procedures set forth in the applicable guidelines."
The parties also agree that pursuant to the underwriter standards warranty, DLJ did not
guaranty that the originators verified the borrowers' information, or guaranty against fraud or
borrower misrepresentation, except insofar as the originator did not follow the guidelines.
The issue of contention between the parties as to the underwriter standards warranty relates
to Home Equity's use of post-origination information "of which the original underwriter may
have been unaware" to prove a breach of the underwriter standards warranty. Home Equity seeks
a ruling on this partial summary judgment motion that it may use post-closing information,
including post-closing income "verification," to establish that the numbers provided to the
underwriters at the time the mortgage loan was approved were "overstated." Home Equity seeks
to use this information to establish that borrowers' DTIs and CLTVs [FN7]
exceeded guideline [*5]requirements.[FN8]

DLJ argues that permitting Home Equity to use post-origination information to prove a
breach would transform the meaning of the underwriting standards warranty into a "no fraud"
warranty. DLJ contends that "information that either post-dated the origination of the loan or was
not required to be considered under the guidelines is not relevant in determining whether there
was a breach of the Rep," and that plaintiffs may not use post-origination information to establish
a breach.
The Court finds that plaintiffs' arguments regarding the originator's alleged use of inflated
incomes to calculate DTI's are only relevant insofar as they establish the originator's failure to
comply with the underwriting guidelines. In other words, on this allegation, I find that Home
Equity may use proof of inflated incomes at trial only to establish that the underwriting
guidelines were not adhered to at the origination stage.
All decisions concerning the type and use of post-origination information at trial are reserved
for a pre-trial motion in limine, as these considerations rely upon an assessment of facts and
expert testimony, which is simply not appropriate on a motion for summary judgment.
The Maximum CLTV Warranty
The Maximum CLTV Warranty provides that "No Mortgage Loan had a combined
loan-to-value ratio at the time of origination of more than 100%." Under the PSAs, the term
"Combined Loan-to-Value Ratio" means: "With respect to any Mortgage Loan and as of any date
of determination, the fraction (expressed as a percentage) the numerator of which is the sum of
(i) original principal balance of the related Mortgage Loan at such date of determination and (ii)
the unpaid principal balance of the related First Mortgage Loan as of either the date of
origination of that Mortgage Loan or the date of origination of the related First Mortgage Loan
and the denominator of which is the most recent Appraised Value of the related Mortgaged
Property." The term "appraised value" is defined under the PSA as "[t]he amount set forth in an
appraisal of the related Mortgage Loan as the value of the Mortgaged Property."
Home Equity alleges here, as is alleged in many RMBS put-back actions, that the appraisals
underlying the subject mortgage loans were systematically inflated, and, as a result, [*6]the CLTV ratios were artificially kept under the warrantied value of
100%.
Home Equity ostensibly asks me to simply hold as a matter of law that the maximum CLTV
warranty requires that no loan had a CLTV ratio over 100%, and any loan with an actual CLTV
over 100% is a breach of this warranty. [FN9]
 
While couched in terms of a summary judgment motion, Home Equity really seeks pretrial
approval to establish a breach of the maximum CLTV warranty "by showing an appraisal
underlying a Loan's CLTV ratio was misstated to the point that the actual, recalculated CLTV
ratio is over 100%." Home Equity adds that this is a breach "regardless of whether the appraiser
subjectively believed his or her appraisal to be false." Here again, Home Equity seek to use
post-origination documentation to establish these breaches.
The parties and I agree that, pursuant to the language of the maximum CLTV warranty,
where a mortgage loan contains a CLTV that is greater than 100%, DLJ breached the warranty. 
Where the originator did not follow the underwriting guidelines, with respect to determining the
CLTV, this is a clearly a breach.
In its opposition and in support of its own motion for summary judgment, DLJ correctly
argues that Home Equity is not asking me to rule on the meaning of this warranty but instead
seeks permission to establish through Automated Value Models ("AVMs") that the appraised
values were over-inflated and through their use in the calculations of the CLTV ratios, DLJ
breached this warranty.[FN10]

DLJ contends that Home Equity may not use statistical AVMs [FN11]
to establish breaches of the CLTV warranty or the underwriting standards warranty. DLJ further
contends that, because the use of AVMs is not permitted under the PSAs, and because Home
Equity only challenges the CLTV ratios using AVMs, Home Equity's breach of the CLTV
warranty claim fails as a matter of law.
Specifically, DLJ cites the PSA language defining CLTVs as "fractions (expressed as a
percentage), the numerator of which is the [loan balance at origination] and the denominator of
which is the most recent Appraised Value of the related Mortgage Property." Based upon this
definition, DLJ argues that the PSAs do not permit the substitution of AVMs for actual
appraisals in calculating the CLTV ratios.
DLJ also argues that Home Equity could have, but did not, use appraisers to re-calculate the
value of each property, and that appraisals are considered in the mortgage industry to be the most
reliable method to value properties.
Home Equity replies that it is not "substituting" the AVM values for the appraised values,
but it is "using the AVM values, and expert opinion based on those AVM values, as evidence
showing the appraised values were false."[FN12]
Home Equity also disputes DLJ's assertion that AVM values are not reliable. Home Equity points
out that: (1) Credit Suisse's underwriting guidelines state that AVMs are an acceptable method of
valuing a property, (2) DLJ uses AVMs to confirm the appraised value of properties in its
acquisition due diligence for bulk loans, and (3) DLJ uses AVM values to "update CLTV values
that it listed on the Mortgage Loan Schedule for seasoned Loans." 
Finally, Home Equity argues that it would render the warranties meaningless to require a
breach to be proven using a new appraisal, as it would be an unreasonable burden for Home
Equity to conduct new appraisals for all the underlying mortgaged properties in the Trusts.
To the extent that DLJ relies upon the definition of the CLTV ratio, which includes the use
of appraisals, to argue that AVMs are not permitted as proof to show a breach of a warranty, and
further argues that Home Equity's breach of the CLTV ratio claim then fails as a matter of law
because Home Equity proffers AVMs as part of its proof, I deny dismissal of Home Equity's
claim on that ground. There is no indication that the PSAs definition of the CLTV ratio, which
contemplated that the originators would use appraisals to calculate CLTVs, barred the Trusts' use
of AVMs to determine whether the CLTV ratio was artificially deflated by the originators to
comply with the CLTV ratio warranty.
However, whether Home Equity may prove breach of the CLTV ratio warranties and [*7]underwriter standards warranties through use of AVMs and expert
testimony, or any other type of evidence for that matter, is not appropriately resolved on these
summary judgment motions. As the parties well know, the role of the court on a motion for
summary judgment, "is not to try the facts, but rather to determine whether evidence sufficient to
require a trial of any issue of fact exists. '[I]t is the earmark of summary judgment that the court
is confined to determining whether an issue of fact exists as a matter of law'." State of New
York v. Metz, 241 AD2d 192, 198 (1st Dept 1998) (internal citations omitted). Like many of
the other issues the parties have asked me to resolve, the issue of whether this proof is of
sufficient quality and reliability should be resolved in motions in limine brought before trial.
Interpretation of the Term "Material and Adverse"
Under Section 2.03 (g) of the PSA, only those warranty breaches that materially and
adversely affect Home Equity's interest in the loans are subject to repurchase. Home Equity has
no remedy for a warranty breach if the element of material and adverse is not met.
Home Equity argues that this Court should find, as a matter of law, that to prove that a
breach caused a "material and adverse" effect, the plaintiff need not establish the loan was in
default but must only prove that a warranty's breach by DLJ "significantly increased a loan's risk
of loss." In opposition, DLJ argues that the meaning of "material and adverse" is ambiguous, and,
therefore, a fact question exists, and the issue cannot be decided on summary judgment. Further,
DLJ argues that the term "material and adverse effect" cannot be interpreted to mean "increase a
Loan's risk of loss," under the language of the PSA. DLJ argues: "By using the present tense
"affect," and not the subjunctive 'may affect,' the PSA requires proof of a present injury that is
material and adverse (e.g., an actual loss), not an undefined and speculative risk of future loss
that has not materialized."
The absolute meaning of the term material and adverse has not been determined. MBIA Ins. Corp. v. Credit Suisse Sec.
(USA) LLC, 55 Misc 3d 1204 (A), *5 (2017)("There appears to be a split over whether
the meaning of the words "material and adverse" is a question for the trier of fact or an issue of
law that the court may decide on summary judgment") affd 165 AD3d 108 (1st Dept
2018); see also MBIA Ins. Corp. v Countrywide Home Loans, Inc., 105 AD3d at 413,
(1st Dept 2013). 
However, and at a minimum, many courts have concluded that a plaintiff need not prove a
default to establish a "material and adverse" breach. See MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 105 AD3d
412 (1st Dept 2013); Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A., 2014
WL 1259630, at *4 ("A growing consensus among New York courts holds that MAE repurchase
conditions are triggered when the plaintiff's risk of loss increases and not just when that risk
actualizes") affd 643 Fed Appx 44 [2d Cir 2016]; MASTR Adjustable Rate
Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc., 2015 WL 764665, *15 (S.D.NY
2015).
In Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, (892 F.Supp.2d at 602
[S.D.NY 2012]), the Court decided the meaning of "material and adverse" on summary
judgment. The court ruled: "the further requirement that breaches of these representations and
warranties be 'material and adverse' mean that 'plaintiff must only show that [Flagstar's] breaches
[of the representations and warranties] materially increased its risk of loss'." Flagstar, 920
F.Supp.2d at 509; see also MBIA Ins. Corp. v. Credit Suisse, 55 Misc 3d 1204(A), *5 (Sup.
Ct. NY Co., 2017).
Nowhere in the PSAs, let alone in Section 2.03 (f) or (g), does it say that the loan must be in
default for it to be repurchased. Because the PSAs do not require a default for there to be a [*8]breach of a warranty made in the PSAs, Home Equity's motion is
granted to the extent that I interpret "material and adverse," consistent with the PSAs and the
relevant New York State cases, as requiring only a showing that the alleged breach of a warranty
materially increased the risk of loss.
The Use of Statistical Sampling
Home Equity argues that under the PSA it is permitted to use statistical sampling to prove
DLJ's liability and damages with respect to liquidated loans, or, in other words, loans that left the
Trusts with a loss, and that DLJ cannot repurchase. Those mortgage loans can no longer be
returned to Home Equity or substituted. Specifically, Home Equity argues that loan-by-loan proof
of these damages is not required under the PSA. Home Equity seeks monetary damages for the
22,013 liquidated loans in the Trusts as of March 2016, which include losses totaling
$1,008,500,000. DLJ argues in opposition that sampling is not permissible under the language of
the PSA, which requires loan-by-loan proof of both the breach and the loan-specified price. 
Home Equity argues first and foremost that Justice Schweitzer has already ruled, in a
November 18, 2013 Interim Order, that plaintiffs would be permitted to use statistical sampling
to prove both liability and damages. Home Equity contends that the November 18, 2013 Interim
Order is law of the case and that, therefore, I must permit statistical sampling at trial. 
In opposition, DLJ argues that Justice Schweitzer's November 18, 2013 Interim Order "did
not rule on whether Plaintiffs could prove each element of their claim through sampling" and is
not law of the case. DLJ further argues that the November 18, 2013 Interim Order is not the law
of the case because the parties did not brief, the "Repurchase Protocol or corresponding notice
requirements," and that Justice Schweitzer limited plaintiffs' claim to those loans "for which
notice has been given."
The doctrine of law of the case "precludes parties or their privies from relitigating an issue
that has already been decided." Chanice
v. Federal Express Corp., 118 AD3d 634, 635 (1st Dept 2014). It generally serves to
"preclude successive motions by the same party upon the same proof." Ruiz v. Anderson, 96 AD3d 691,
692 (1st Dept 2012). The doctrine "contemplates that the parties had a full and fair opportunity
to litigate when the initial determination was made." Id.
In the November 18, 2013 Interim Order Justice Schweitzer plainly stated that "plaintiffs' use
of statistical sampling to prove liability and damages would streamline the trial, promote judicial
economy, and conserve the resources of the parties and the court." Justice Schweitzer therefore
permits plaintiffs "to use a statistical sampling to prove liability and damages on all of their
claims" and, finally, directs the parties to "meet and confer as to the sample to be used."
Justice Schweitzer's November 18, 2013 Interim Order is law of the case. Justice
Schweitzer ruled on the issue of plaintiffs' use of sampling at trial to establish liability and
damages, which is squarely before me on these motions for partial summary judgment. The
November 13, 2013 Interim Order has not been appealed and, despite DLJ's argument to the
contrary, the parties had a full opportunity to litigate the issue before Justice Schweitzer and did
so. 
For example, in their November 15, 2013 letter brief to Justice Schweitzer on the issue of
sampling, DLJ argued that sampling is "incompatible" with the repurchase protocol as it is set
forth in the PSA. I note that DLJ's two and one- half page letter sent to Justice Schweitzer is
approximately the same length as the argument against sampling appearing in the opposition
memorandum on this motion. DLJ sets forth the same argument before me as before Justice
[*9]Schweitzer, i.e., that the language of the PSAs'
repurchase protocol prohibits the use of sampling to make out Home Equity's burden of proof.

Because Justice Schweitzer's November 18, 2013 Interim Order is law of the case, I am
bound to follow it. I note that the parties have engaged in more than four years of discovery, both
fact and expert, under Justice Schweitzer's mandate that plaintiffs' may use sampling at trial.
Issues concerning the sufficiency of the sample itself will be addressed pre-trial in motions in
limine. 
Plaintiffs' Litigation Expenses
Home Equity argues that an RMBS plaintiff may recover attorneys' fees under a contract that
provides that defendant shall "promptly reimburse . . . the Trustee for any actual out-of-pocket
expenses reasonably incurred by . . . the Trustee in respect of enforcing the remedies for such
breach." The PSAs Repurchase Protocol, Section 2.03 (g) of the 2006-3 PSAs and Section 2.03
(f) in the 2006-4 and 2006-5 PSAs, contain such a provision: "[DLJ] shall promptly reimburse
the Trustee for any actual out-of-pocket expenses reasonably incurred by the Trustee in respect of
enforcing the remedies for such breach."
In opposition, DLJ argues that this provision limits any reimbursement of litigation expenses
to "actual-out-of-pocket expenses," and does not include shifting payment of attorneys' fees.
Further, because the Trustee is not incurring actual out of pocket expenses, as the Trustee's legal
expenses are being indemnified by certificate holders, summary judgment as to attorneys' fees is
not appropriate.
In U.S. Bank Natl. Assn. v. DLJ
Mtge. Capital Inc., 140 AD3d 518 (1st Dept 2016), the First Department held that the
following contract language, which is same as contained in the PSAs at issue here, included
reimbursement of attorneys' fees: "Seller shall promptly reimburse the Trustee for any actual
out-of-pocket expenses reasonably incurred by the Trustee in respect of enforcing the remedies
for such breach." Id. at 519. The Court stated: "[t]he unmistakable intent of the parties to
the PSAs is that enforcement expenses to be reimbursed include attorneys' fees incurred in
bringing these actions." Id. at 519. 
Thus, I hold that, if that Home Equity is successful in proving liability for breaches of the
warranties contained in the PSAs, it may seek attorneys' fees as a component of its damages. 

DLJ's Affirmative Defenses
Home Equity argues that several affirmative defenses asserted by DLJ are not viable and
asks that these affirmative defenses be dismissed as a matter of law. I address the challenged
affirmative defenses below.
Loss Causation Affirmative Defense
DLJ's fourth affirmative defense states that plaintiffs' damages "resulted from causes other
than any alleged act or omission by DLJ." As to this defense, Home Equity argues that because
the First Department has ruled that a plaintiff in an RMBS put-back action need not establish a
default of the loan to prove that a breach of the warranty was material, DLJ "cannot avoid
liability through an argument that causes other than DLJ's warranty breaches caused Plaintiffs'
losses."
DLJ argues that at trial the evidence will demonstrate that any damages suffered by Home
Equity resulted from causes unrelated to any alleged breach of a representation or warranty, "such
as the global downturn in the housing markets." DLJ argues that, like any other plaintiff, Home
Equity must prove that the alleged breach of the warranty was the proximate cause of Home
Equity's damages. 
"In contract as in tort cases, questions of proximate cause, including intervening cause,
'should generally be resolved by the factfinder'." NAF Holdings, LLC v. Li & Fung
(Trading) Limited, 2016 WL 3098842, *6 (S.D.NY 2016), quoting Voss v. Netherlands Ins. Co.,
22 NY3d 728, 737 (2014). I adhere to this well-settled legal principle and deny Home
Equity's motion to strike this affirmative defense. Questions of fact concerning proximate cause
are appropriately determined at trial, not on a summary judgment motion.
Economic Loss Affirmative Defense
DLJ has asserted in its sixth affirmative defense: "Plaintiffs' claims are barred, in whole or in
part, by the economic loss rule and similar doctrines that preclude recovery in tort to parties with
an express contractual agreement." With respect to this affirmative defense, DLJ claims that
"Plaintiffs have asserted unjust enrichment claims not predicated on the contracts. These claims
are barred by the parties' express agreements."
Home Equity argues that DLJ's sixth affirmative defense fails as a matter of law because
Home Equity's unjust enrichment claim arises from a duty that is separate and apart from its
contracts with DLJ, thus the economic loss doctrine is not applicable. 
In the complaint, Home Equity alleges that: "DLJ was enriched at the expense of the Trusts
and their Certificateholders to the extent DLJ received settlement funds in respect of Mortgage
Loans owned by or transferred to the Trusts and failed to pay those monies to the Trusts. . . .."
The unjust enrichment cause of action arises out of alleged secret settlements between DLJ and
the originators of mortgage loans that were owned by the Trusts, for which the Trusts allegedly
never received any payment from DLJ. 
In its motion to dismiss, DLJ sought to dismiss plaintiffs' unjust enrichment claim, arguing
that it was duplicative of plaintiffs' breach of contract claims. Justice Schweitzer denied DLJ's
motion to dismiss the unjust enrichment claim, stating that "if the PSAs strictly require DLJ to
transmit its settlement recoveries to the Trusts, the Trust's contract claims will control, if, as DLJ
argues, the PSAs do not cover the same R & Ws through which DLJ secretly settled with
originators, the Trusts' unjust enrichment claim is not precluded for covering the same 'subject
matter' as the contract claims." 
Where no independent legal duty has been alleged, separate and apart from the contractual
relationship between the parties, and the claim is simply duplicative of the breach of contract
claim, then the economic loss doctrine will bar this redundant claim. Here, there are questions of
material fact concerning whether this claim is duplicative of plaintiffs' breach of contract claim.
The Court, therefore will not dismiss this affirmative defense. 
Standing Affirmative Defense
Plaintiffs seek to dismiss DLJ's eighth affirmative defense, which argues that plaintiffs lack
standing to sue to enforce the transaction documents. Plaintiffs argue that this issue has already
been determined in this action. DLJ concedes that this issue has previously determined by Justice
Schweitzer in connection with DLJ's motion to dismiss, and that standing has been established.
Accordingly, I dismiss the eighth affirmative defense.
Remedy at Law Affirmative Defense
Home Equity seeks dismissal of DLJ's ninth affirmative defense, in which DLJ alleges that
Home Equity has "an adequate remedy at law, barring any equitable relief." As discussed above,
Home Equity may seek all damages available at law or in equity arising from the breach of the
repurchase obligation, and where specific performance is impossible.
Equitable Affirmative Defenses
Home Equity seeks to dismiss DLJ's second affirmative defense, which states that the claims
are barred by "the doctrines of waiver, laches, acquiescence and/or estoppel." Home Equity
argues that that, "consistent with their contractual obligations, the Trustee notified DLJ of
Warranty breaches promptly after it was notified of them, and there is no evidence that it waived
any rights or made any false statements." Home Equity further argues that "because the Trustee
'had no contractual obligation to invoke the investor-driven remedies in the PSA's—or
otherwise 'object' to [DLJ's] . . . breach other than by bringing suit within the applicable statute of
limitations,' and because the contracts did not give it the ability to waive compliance with the
Warranties and Repurchase Protocol, there is no basis to invoke waiver, laches, acquiescence, or
estoppel here."
In opposition, DLJ argues only that Home Equity must offer affirmative evidence of its
entitlement to summary judgment dismissing an affirmative defense, and that DLJ has the right
to raise these equitable affirmative defenses considering "the prejudice DLJ has suffered based
on the Trustee's spoliation of discoverable evidence." DLJ then refers to six pages of a witness's
deposition testimony that relates to manually saving documents that were put on a litigation hold.
DLJ does not specifically argue in support of the substance of any of these equitable
defenses.
Based upon the party submissions, there are no facts supporting the imposition of any of the
equitable affirmative defenses asserted by DLJ in the second affirmative defense. I therefore
dismiss this affirmative defense. See Courtney-Clarke v. Rizzoli Intl. Publs., Inc., 251
AD2d 13 (1st Dept 1998).
Unclean Hands
In DLJ's third affirmative defense, DLJ alleges that Home Equities' claims are barred by the
"doctrine of unclean hands." The doctrine of unclean hands is only applicable "'when the
conduct relie[d] on is directly related to the subject matter in litigation and the party seeking to
invoke the doctrine was injured by such conduct'." Sutter v. Lane, 61 AD3d 1310, 1313 (3d Dept 2009). DLJ's only
alleged basis for this defense is "plaintiffs' inequitable conduct, including the prejudice DLJ has
suffered based on the Trustee's spoliation of discoverable evidence."
The conduct relied upon by DLJ to support this affirmative defense, alleged spoliation of
evidence, does not directly relate to the subject matter of this action. For this reason, I dismiss
the third affirmative defense.
Calculation of Damages
DLJ argues that the calculation of the repurchase price for any breaching loan, "does not
include interest after that loan was liquidated." DLJ claims, without any support, that once a loan
is liquidated and charged off from a trust, it can no longer accrue any interest. 
In opposition, Home Equity argues that under Nomura, 133 AD3d 96, it is entitled to
the repurchase price, including interest, for defective liquidated loans, because those loans are
subject to the Repurchase Protocol. I agree.
The PSAs define the repurchase price as "an amount equal to the sum of (i) 100% of the
unpaid principal balance of the Mortgage Loan on the date of such purchase; [and] (ii) accrued
and unpaid interest thereon at the applicable Mortgage Rate from the date through which interest
was last paid by the Mortgagor to the Due Date in the month in which the Repurchase Price is to
be distributed to Certificateholders."
In Nomura, the First Department upheld the lower court's finding that the Trust is
entitled [*10]to monetary damages for liquidated loans, where
cure or repurchase was impossible. In the decision, the Court notes that the lower court "rejected
the defendant's argument that liquidated loans are not subject to the repurchase protocol," which
includes a definition of "purchase price" not unlike the one here. 
In so doing, the Court devised an extension of the repurchase protocol to liquidated loans, to
avoid the instance where a sponsor might seek to fill a trust with "junk mortgages that would
'expeditiously default' so they can be liquidated before a repurchase claim is made." Accordingly,
as there is no language in the PSAs supporting an alternative calculation, the repurchase price for
liquidated loans remains the same as for non-liquidated loans.
Therefore, the remedy for all loans, liquidated or not, is subject to the terms of the repurchase
protocol. According to that protocol, interest is calculated "from the date through which interest
was last paid by the Mortgagor to the Due Date in the month in which the Repurchase Price is to
be distributed to Certificateholders." The amount of the unpaid principal and interest for
liquidated loans will be determined according to the repurchase protocol. 
The Date for Damages Calculation
DLJ argues that damages must be calculated beginning one hundred and twenty days after
DLJ received notice of a breach for each specific nonconforming loan. DLJ takes issue with
Home Equity's damages calculation, which uses a repurchase date of April 5, 2012 for all loans,
"regardless of when DLJ received notice of breach." In opposition, Home Equity argues that the
repurchase price should be calculated 120 days from the November 22, 2011 demand letter, when
DLJ should have repurchased all defective loans.
Under the PSAs, the repurchase price is defined as the unpaid principal balance of the
Mortgage Loan "on the date of such purchase." Thus, the price is calculated as of the date of
repurchase, which would be triggered by either Home Equity's notice of a breach or DLJ's
discovery/knowledge of a breach. The repurchase date for each loan therefore cannot be
determined as a matter of law at this time. This issue will be determined based on the facts
presented at trial.
DLJ's remaining arguments were addressed above in the context of Home Equity's partial
summary judgment motion.
In accordance with the foregoing, it is
ORDERED that plaintiffs Home Equity Mortgage Trust Series 2006-1, Home Equity
Mortgage Trust Series, 2006-3, Home Equity Trust Mortgage Trust Series 2006-4, and Home
Equity Mortgage Trust Series 2006-5 motions for partial summary judgment motion (motion
sequence no. 30, under index number 653787/12, and 32, under index no. 156016/2012) are
granted on the grounds as stated above, and denied as to all other grounds; and it is further
ORDERED that defendant DLJ Mortgage Capital, Inc.'s motions for partial summary
judgment (motion sequence no. 31, under index number 653787/12, and 33, under index no.
156016/2012) are denied as set forth above.
ORDERED that counsel for the parties are directed to appear for a conference in Room 208,
at 60 Centre Street, on February 20, 2019, at 2:15 p.m.
This constitutes the decision and order of the Court.
Dated: January 9, 2019
New York, NY 
E N T E R:
_________________________
Hon. Saliann
Scarpulla, J.S.C.



Footnotes

Footnote 1:Plaintiffs are not pursuing claims
with respect to the loans that had been paid in full as of March 2014.
Footnote 2:Plaintiffs' expert, Mr. Richard
Payne III ("Payne"), reviewed 1,600 loans, 400 loans per Trust, which were selected by plaintiffs'
expert Dr. Snow, as a sample out of the approximately 26,459 loans in the four Trusts that had
not been paid in full as of March 2014.

Footnote 3:For example, in the Rule 19-a
Statement of Facts, plaintiffs cite to numerous DLJ emails and testimony to support their
argument.

Footnote 4:"[T]he Court should resolve the
meanings of the key Warranties at issue that DLJ made in the governing [PSAs]."

Footnote 5:Thus, DLJ argues, "[t]he very
notion that there exists a single "true" income is insupportable. Income and other similar
measures are highly variable based on what sources are included or excluded and what time
periods are reviewed."
Footnote 6:DTI is shorthand for debt to
income ratio, a common indicator used by mortgage lenders to determine whether a potential
borrower will be able to repay the mortgage loan.

Footnote 7:CLTV is shorthand for combined
loan to value ratio, which is a calculation of the ratio of all loans on a property to the fair market
value of the property.

Footnote 8:Addressing the question of
reasonableness, plaintiffs' expert, Richard W. Payne III ("Payne"), opined in his report that "many
of the Mortgage Loans were not underwritten in accordance with the Originator's Underwriting
Guidelines." According to Payne, "[b]ecause of the undocumented nature of the salary
information in a stated income loan, the originator often required underwriters to assess the
salary to determine whether it was reasonable, given the information in the homeowner's loan." 
On this point, he continues "[u]nder DLJ, Credit Suisse, and America Home Mortgages
guidelines, for example, "[a] 'reasonableness test' is applied to the stated income to ensure that it
is appropriate for the job description." Thus, although income is not verified, the income must be
"reasonable for the profession and experience level of the borrower," and assessed according to
"geographic region" and "time in the profession." However, according to Payne, the assessment
of the reasonableness of a borrower's stated, unverified income would not eliminate the risk of
borrower misrepresentation, which is why stated income loans had a higher interest rate.

Footnote 9:Plaintiffs' expert, Payne, opines,
with respect to CLTV ratios under the PSAs, as follows: "If a borrower obtained a second-lien
mortgage on the property, the CLTV ratio compared the combined balance of the first-and
second-lien mortgages against the lesser of the property's appraised value or its purchase price. 
All else being equal, a higher CLTV and/or LTV ratio was indicative of a higher risk of
delinquency and default and a lesser amount available as a secondary source of repayment on the
loan. Many of the Originators limited the maximum permissible CLTV and LTV ratios to 95%,
depending on factors such as the borrower's credit score and level of income documentation. 
However, it was not unusual for the underwriting guidelines of subprime or Alt-A lenders to
permit approval of mortgages with LTV or CLTV ratios up to 100% if certain conditions were
met. Many of the Originators' underwriting guidelines capped the maximum allowable CLTV
ratio at 100%."

Footnote 10:In his expert report, Joel
Spolin ("Spolin") takes issue with how Payne uses post-origination information as evidence of
underwriting defects at origination. He states, in part: "Even if these Retrospective AVM values
had existed at the time of origination, it would be improper and impractical for the original
underwriter to use them to second guess the value opinion embodied in the guideline-mandated
appraisals performed by a licensed appraiser."

Footnote 11:An AVM is "a computerized
valuation based on mathematical modeling that utilized a nationwide database of real estate sales
and prices to generate a value for the subject property." 

Footnote 12:Home Equity argues that the
CLTV ratios were materially higher than the warrantied amount of 100% because the originator's
underwriters used "inflated" appraisals in calculating these ratios. Home Equity contends that, if
the appraisers used the actual property values, instead of artificially inflated appraisals, the CLTV
rations would have been more than 100%, breaching the CLTV warranty.